**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CENTENNIAL BANK,

     Plaintiff,

v.

GREAT AMERICAN INSURANCE
COMPANY & GREAT AMERICAN
E&S INSURANCE COMPANY

     Defendants.

Case No. 1:21-mc-00018
(*N.D. Fla. Case No. 4:18-cv-450-AW-MAF*)

---

**PLAINTIFF CENTENNIAL BANK'S MOTION TO OVERRULE OBJECTIONS TO
SUBPOENA FOR PRODUCTION OF DOCUMENTS AND COMPEL
PRODUCTION FROM DEFENDANTS, GREAT AMERICAN INSURANCE COMPANY
AND GREAT AMERICAN E&S INSURANCE COMPANY**

---

Plaintiff, CENTENNIAL BANK ("Centennial"), moves pursuant to Federal Rule of Civil

Procedure 45, for an order overruling objections made by Defendants, GREAT AMERICAN

INSURANCE COMPANY and GREAT AMERICAN E&S INSURANCE COMPANY

(collectively, "Great American"), to Centennial's Subpoena for Production of Documents (the

"Subpoena"), and compelling Great American to provide full and complete responses to the

Subpoena.  This motion is supported by the memorandum that follows.

     Respectfully submitted,

      /s/ Peter J. O'Shea
     Peter J. O'Shea (0086560)
     Katz Teller Brant & Hild
     255 East Fifth Street, Suite 2400
     Cincinnati, OH 45202
     Telephone:  (513) 721-4532
     Facsimile: (513) 977-3401
     Email: poshea@katzteller.com

-and-

Keith L. Bell, Jr. (FL Bar 573809)*
Trevor A. Thompson (FL Bar 0068006)*
Clark Partington
215 South Monroe Street, Suite 530
Tallahassee, FL 32301
Telephone: (850) 320-6827
Facsimile: (850) 597-7591
Email: kbell@clarkpartington.com
Email: tthompson@clarkpartington.com

*Motion for admission pro hac vice forthcoming

**Attorneys for Plaintiff Centennial Bank**

## MEMORANDUM

This Motion to Compel production arises from a discovery dispute related to a putative class action pending in the Northern District of Florida. As detailed below, Centennial seeks documents and information from a former party to the underlying litigation, Great American, that are highly relevant to the claims made, and defenses asserted, in the underlying litigation.

## I.    PROCEDURAL BACKGROUND

This motion arises from a putative class action pending in the Northern District of Florida challenging the placement of force-placed insurance ("FPI") on class members.  The underlying case was initiated on October 1, 2018 and Great American Insurance Company was initially a defendant.  *See* N.D. Fla. Case No. 4:18-cv-450-AW-MAF (the "*Florida Case*"), ECF No. 1. Great American Insurance Company reached a settlement with the class representative and was dismissed by order dated December 19, 2018.  *Florida Case*, ECF No. 50.

After substantial motion practice, the operative complaint in the *Florida Case* is the Second Amended Complaint (the "SAC") located at docket number 57.  The SAC includes one defendant—Centennial—and two breach of contract counts for damages, with all counts after Count II having been dismissed by later court order.  A true and correct copy of the SAC is attached hereto as **Exhibit 1**.

On April 19, 2021, Centennial gave notice to all litigants and issued subpoenas for document production (and corresponding deposition subpoenas) to multiple non-parties, including Great American.  A true and correct copy of the subpoenas to Great American (collectively, the

"Subpoena")[1] are attached hereto as **Composite Exhibit 2**.  The Subpoena required compliance by June 9, 2021.

Centennial served the Subpoena on Great American's agent for service of process as an insurer in the State of Florida[2] and service was ultimately perfected on Great American by electronic delivery on Friday May 7, 2021.  A true and correct copy of the return of service establishing delivery to Great American is attached hereto as **Exhibit 3**.  Great American had thirty-three days for compliance with the Subpoena as of the date of service.

On June 2, 2021, twenty-six days after service, counsel for Great American telephonically contacted counsel for Centennial.  Counsel for Great American requested a two-week extension of time to respond to the Subpoena and Centennial granted the request, leaving the deadline for production as June 23, 2021. The telephonic conversation was confirmed by email.[3]

---

[1] Distinct documentary subpoenas were produced to both affiliated entities with an express stipulation and warning that parallel subpoenas were delivered to separate corporate affiliates but that one joint production was contemplated.  Given the material similarity, Centennial will characterize this as a single subpoena for the purposes of this motion.

[2] Section 624.422(3), Florida Statutes, provides that service upon Florida's Chief Financial Officer "shall be the sole method of service of process upon an authorized domestic, foreign, or alien insurer in this state." Subsection (2) of the statute requires insurers to designate a single point of contact for insurers.  Great American is an authorized insurer in the State of Florida.  *See* https://www.floir.com/companysearch/. Service is perfected when the CFO delivers materials to the insurer.  *See* Fla. Stat. § 624.423.  Great American E&S does not have a foreign registration in the State of Florida, however, and the address on file with the Florida Office of Insurance Regulation is located in Ohio.  As such, Great American E&S was personally served on May 10, 2021; the difference from the May 7 date is immaterial to this motion.

[3] As a matter of general practice and courtesy, counsel for Centennial generally reserves attachment of attorney correspondence unless matters are contested.  The descriptions herein are based on a direct review of the characterized correspondence and Centennial is prepared to supplement at any time on request of the Court.  Characterizations of telephonic conversations are not essential to this motion but are included for background purposes.

Because of issues arising with other non-parties, Centennial postponed its scheduled Rule 45 depositions then scheduled for late June 2021. Specifically, the Plaintiff in the *Florida Case* had pending a motion for leave to add new counts under RICO and bring at least six new defendants into the litigation, including many recipients of Centennial's subpoenas. Such non-parties resisted Rule 45 discovery in light of the impending counts, which as a practical matter effectively reset the expiring discovery calendar. As a matter of efficiency, particularly considering the generous standards on a motion for leave to amend, Centennial postponed all discovery pending resolution of the discovery dispute.

As part of the postponement process, on June 16, 2021, counsel for Centennial left a voice mail for Great American's counsel and followed up by email to Great American's counsel confirming that the Rule 45 depositions would be rescheduled.

On June 17, 2021, counsel for Great American sought a further extension of time to produce documents until July 16, 2021. Counsel for Centennial responded by email the next day proposing a shorter extension, through July 9-12, to allow more time to address any potential discovery disagreements. At the time, Centennial anticipated a potential motion to quash or modify the subpoena on undue burden grounds from all of its subpoena recipients, as one of the recipients had done in late May.

Before agreement on the additional extension, and without filing a motion to quash or modify under Rule 45(d), Great American responded to the Subpoena on June 23, 2021 (the "Response"). Great American produced between 1,000 to 1,500 pages of material and served a response with objections to every request for production. The response indicated that the production was made subject to the objections. Some requests have language suggesting that no

5

responsive documents existed but the response is not complete given that the requests are still subject to the objections. A true and correct copy of the Response is attached hereto as **Exhibit 4**.

The documents produced consist predominantly of (1) the underwriting file related to Centennial Bank; and (2) documents produced to certain insurance commissioners ostensibly for the purpose of rate approval. Great American did not file any motion related to the Subpoena (under Rule 45 or otherwise), nor has it produced a privilege log pursuant to Rule 45(e)(2).

The district court in the Florida case denied the Plaintiff's motion for leave to amend the complaint by order dated July 30, 2021. *Florida Case*, ECF No. 145. Centennial began the process of addressing pending discovery issues thereafter.

Counsel for Plaintiff, Centennial, and Great American conferred telephonically by phone on August 5, 2021. Counsel for Great American raised additional matters and detail not included in the objection, which will be discussed below. The Parties have been unable to reach a resolution to Great American's objections, though Centennial is prepared to continue discussing a resolution during the pendency of this motion.

Centennial requests that this Court overrule the objections stated in Great American's Response and compel Great American to comply with the Subpoena because (1) the objections stated in Great American's Response were untimely under Rule 45(d)(2)(B) and thus waived; (2) the objections in Great American's Response should be treated as waived as boilerplate objections; and (3) even if considered, the objections in Great American's Response are insufficiently stated and supported to preclude discovery of relevant material.

## II.   ARGUMENT OF LAW

A.   <u>The objections should be overruled as procedurally defective.</u>

1.   *The objections were waived by not being timely filed under Rule 45(d)(2)(B).*

Under Federal Rule of Civil Procedure 45, a non-party recipient of a subpoena to produce documents may either move to quash the subpoena under Rule 45(d)(3) or may serve objection to the subpoena under Rule 45(d)(2)(B).  Because Great American did not move the quash the Subpoena, and because Great American has purportedly objected to the document requests, only Rule 45(d)(2)(B) is at issue here.  *See generally Martin v. Trott Law, P.C.*, Civ. No. 15-12838, 2016 WL 9450599, at *3 (E.D. Mich. Dec. 22, 2016) (discussing difference in timeliness between objections and motions to quash)

In this case, Great American's objections were untimely if served after May 21, 2021.  Rule 45(d)(2)(B) permits responding parties to provide written objections to any or all of the requested materials or to providing ESI in the requested forms.  However, the rule expressly requires that "[t]he objection must be served before the <u>earlier</u> of the time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B) (emphasis added).  Under the Subpoena, the time specified for compliance was June 9, 2021 (extended by agreement to June 23, 2021) and 14 days after subpoena was served was May 21, 2021—the earlier date.

The weight of authority holds that failing to serve written objections within the period specified by Rule 45 waives the objections.  *See Arndt v. Ford Motor Co.*, No. 2:15-cv-11108, 2016 WL 1161444, at *2 (E.D. Mich. Mar. 24, 2016); *see also, e.g.*, *Liberato v. Armor Corr. Health Servs., Inc.*, No. 3:19cv00042, 2020 WL 2564681, at *3 (citing *In re Motorsports*

*Merchandise Antitrust Litig.*, 186 F.R.D. 344, 349 (W.D. Va. 1999) as collecting cases before amendments when applicable rule was Rule 45(c)(2)(B)).

While courts may excuse timeliness for unusual circumstances and for good cause, *Am. Elec. Power Co. v. United States*, 191 F.R.D. 132, 136–37 (S.D. Ohio 1999), or where the time for compliance is unreasonably short, No. 5:14-cv-11812, *Jenkins v. Mich. Dep't of Corr.*, 2015 WL 1198043, at *2–3 (E.D. Mich. Mar. 16, 2015), neither excuse applies here. Centennial provided ample time to respond to the subpoena, granted a two-week extension, and offered an additional two to three weeks when asked. Great American had ample opportunity to timely object. Moreover, the extension that Centennial granted was for Great American to produce responsive materials—not to object to the Subpoena—because Great American's initial request for an extension occurred outside of the original 14-day period. Regardless, the deadline to object under Rule 45 is the *earlier* of the deadline for compliance or 14 days; even if a new 14-day period were measured from the date of counsels' conversation regarding the first extension of time, June 2, 2021, that period would have expired on June 16, 2021. Written objections were not served until June 23, 2021.

Accordingly, the objections should be overruled as untimely under Rule 45(d)(2)(B) and Great American should be compelled to respond fully to the Subpoena.

        2.     *The Response served only boilerplate objections which should be treated as waived.*

The Response raises every one of its objections in summary form, and fails to explain how the specific objection applies to a given request. This shortcoming is manifested in two forms. First, the Response leads with five "general objections" that object "to each document request to the extent they" do something generally objectionable. Centennial cannot be required to divine

how these objections apply; it is the obligation of the objecting party to explain it. Second, the Response objects to nearly every document request with the following paragraph:

> Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case. Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

E.g., Response at 2–3 (response to first request).[4] Great American then prefaces each substantive response with, "Subject to and without waiving the foregoing objections." Occasionally, Great American contends that there are no responsive documents, but the vast majority of responses suggest that "Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request."

Both the general objections and the request-specific responses are textbook boilerplate objections. *See, e.g.*, *Liguria Foods, Inc. v. Griffith Laboratories, Inc.*, 320 F.R.D. 168, 170 n.1 (N.D. Iowa 2017) (quoting Matthew L. Jarvey, *Boilerplate Discovery Objections: How They are Used, Why They are Wrong, and What We Can Do About Them*, 61 Drake L. Rev. 913, 914–16 (2013)). The hallmarks of boilerplate objections are the failure to specify how a discovery request is deficient within the broader objection, and failing to specify the harm in responding to the request. *See id.* For example, while the Response uses the word "vague" thirty-six times (that is, once in the general objection and thirty-five times in responding to each of the thirty-five requests),

---

[4] The response to the second request is unique in that it omits the third sentence asserting confidential, proprietary, or trade secret information.

not once does the Response explain how or why a request is vague or how Great American will be harmed in responding.

The great weight of authority from district courts requires objections to Rule 45 subpoenas to be specific. In general, these courts hold that boilerplate objections are tantamount to no objection at all and are thus waived. *See, e.g.*, *Amazing Ins., Inc. v. DiManno*, No. 2:19-cv-01349-RLN-CKD, 2020 WL 5440050, at *5–6 (E.D. Cal. Sept. 10, 2020); *Whatley v. World Fuel Servs. Corp.*, No. 20-20993-MC-SCOLA/TORRES, 2020 WL 2616209, at *2–3 (S.D. Fla. May 22, 2020); *A&F Bahamas, LLC v. World Venture Grp., Inc.*, No. CV 17-8523 VAP (SS), 2018 WL 5961297, at *4, 7 (C.D. Cal. Oct. 19, 2018); *MetroPCS v. Thomas*, 327 F.R.D. 600, 607 (N.D. Tex. 2018); *Ceuric v. Tier One, LLC*, 325 F.R.D. 558, 561 (W.D. Pa. 2018); *Mears v. Jones*, No. 1:17-CV-6-KS-MTP, 2017 WL 8682109, at *1 (S.D. Miss. June 13, 2017). Specific objections are necessary to allow meaningful conferral and to permit the moving party's motion to compel to be grounded in specific, potentially rebuttable issues. As it stands, Centennial is forced to file a motion with no reasonable apprehension of which objections Great American intends to rely upon in response. Centennial cannot be in the position of anticipating future objections—the burden is on the party resisting discovery. *E.g.*, *Ceuric*, 325 F.R.D. at 561. For this reason, Great American's production of documents "subject to" its general objections is a practice that district courts increasingly regard with disfavor. *See, e.g.*, *Network Tallahassee, Inc. v. Embarq Corp.*, No. 4:10cv38-RH/WCS, 2010 WL 4569897, at *1 (N.D. Fla. Sept. 20, 2010).

Based on the failure to make any objection with a reasonable level of specificity, this Court should overrule each objection as waived and compel Great American to respond fully to the Subpoena.

10

B.   **Even if considered on the merits, the objections should be overruled because the requested discovery is reasonable and appropriate.**

Great American's procedural deficiencies aside, this Court should also overrule Great American's objections, and compel compliance with the Subpoena, on the merits. In general, the scope of discovery under a Rule 45 subpoena is identical to the scope of discovery under Rule 26. *See, e.g.*, *Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 253 (S.D. Ohio 2011). As such, the appropriateness of Centennial's requests are considered in light of the proportionality factors in Rule 26(b)(1):

> considering [1] the importance of the issues at stake in the action, [2] the amount in controversy, [3] the parties' relative access to relevant information, [4] the parties' resources, [5] the importance of the discovery in resolving the issues, [6] and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Additionally, "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." *Id.* While the context of a Rule 45 subpoena is that a non-party lacks a direct stake in the dispute, the general policy in favor of broad discovery still applies. *See, e.g.*, *U.S. Dep't of Treasury v. Pension Benefit Guar. Corp.*, 301 F.R.D. 20, 25 (D.D.C. 2014).

To date, Plaintiff in the *Florida Case* has declined to adopt a specific model of damages amidst a panoply of generalized, and occasionally conflicting, allegations. Count I asserts that Centennial breaches its mortgage contracts by charging the full amount of insurance premiums which include costs unrelated to insurance coverage in the form of kickbacks to Centennial. SAC ¶ 105. Count II asserts that Centennial breaches the covenant of good faith and fair dealing by improperly exercising its discretion in a variety of ways that allegedly inflate the costs incurred by the class.

11

To that end, the SAC declines to identify any particular causal chain of damages. It alleges that FPI coverage is in general more expensive, suggesting that the class intends to compare FPI pricing to the prices that individual class members could have obtained with regularly procured policies. *See, e.g.*, SAC ¶ 40. The SAC also alleges that Centennial selects the most expensive policy possible to maximize the "kickbacks" that it receives, suggesting that the class intends to compare Great American's policies to competitor's policies. *See, e.g.*, SAC ¶ 64. And the SAC also alleges that Centennial, its retail broker Southern Pioneer, its insurance-tracking vendor and wholesale broker Overby-Seawell Company ("OSC"), and its insurers all conspire to raise the rates that would otherwise be charged by the insurers in the absence of the scheme, suggesting an internal comparison among each insurer. *See, e.g.*, SAC ¶ 66.

While the Plaintiff concedes that Centennial has the right to obtain insurance when borrowers fail to maintain coverage, SAC ¶ 8, Plaintiff has steadfastly maintained maximal flexibility on a theory of damages. Despite ample briefing on a Rule 12(b)(1) motion to dismiss for lack of CAFA amount-in-controversy jurisdiction, the Plaintiff declined to identify any specific causal chain by which Centennial's policies could be measured against a baseline. See *Florida Case* ECF No. 115 at 4–7 (discussing Plaintiff's response to motion to dismiss).

During the class period, Centennial has obtained policies from three different insurers. Great American has been Centennial's exclusive FPI insurer since mid-2016, providing (as relevant to the *Florida Case*) three policies generally described in the Subpoenas: a hazard-and-wind coverage policy (E029008), a monoline-windstorm policy (E029009), and a flood-insurance policy (E029010). As such, Great American has provided the most substantial portion of insurance at issue during the Class Period and is the only insurer that has provided substantial coverage for

all three major perils during the Class Period.  While Great American settled its liability to the Plaintiff prior to class certification, it remains one of the most significant witnesses in the case and Centennial's liability in large part hinges on the question of whether Great American's policies were reasonable.  Accordingly, discovery from Great American is central to the claims made by Plaintiff, and defenses asserted by Centennial, in the *Florida Case*.

1. *Requests 1 and 5 for pricing and publicly disclosed modeling are relevant to the factors relevant to pricing of FPI policies.*

Centennial has requested publicly disclosed pricing information from Great American that is relevant to the pricing models underlying Great American's policies and potential competitive policies in the market.  This information will inform expert opinions on the range of reasonableness for FPI policy costs and where Centennial's policies, under both Great American and the predecessor insurers.

Applying the Rule 26 factors, [1] the matter of market pricing is vital to the issues at stake in the action; [2] the amount in controversy exceeds $5 million based on the district court's denial of Centennial's CAFA arguments and the net written premium during the Class Period exceeds eight figures; [3] Centennial is a lender, not an insurer, and has no central ability to assess publicly-disclosed materials by Great American or materials on competitors, if Centennial could even identify proper competitors; [4] both parties have ample resources but Great American is the subject-matter expert, a former party to this litigation, and the most direct source of the requested information; [5] the discovery is highly relevant, indeed central to, resolving the contested issues; [6] and Centennial has no information on the nature of the burden to Great American to assess the final proportionality factor.  That said, Centennial's focus on information that is public (and thus

13

not commercially protected information) but nevertheless esoteric or difficult to search or assess militates in favor of Centennial on the final balancing test.

> 2. *Requests 2 through 4 are relevant to the question of whether the Centennial-Southern Pioneer relationship affected the price of Great American's policies.*

Centennial has requested information in Great American's possession related to the relationship between Centennial and Southern Pioneer because it is essential to the collusive-arrangement allegations in the SAC. One series of allegations suggests that the value of "kickbacks" from Southern Pioneer and OSC is balanced (in whole or in part) by an increase in the cost of the insurance product. Put another way, the SAC can be read to suggest that if Centennial could obtain an FPI policy from an insurer for a simplified rate of $100, what really happens is that Southern Pioneer and OSC provide $30 in benefits to Centennial and the price that Centennial is actually charged is some higher figure like $120 or $140. That is, it proposes a series of "interlocking" agreements the purpose of which is to increase the cost of the product to provide benefits to all of the other parties. In addition to myriad factual disputes, Centennial's position on this issue is that insurers' pricing is insensitive to downstream arrangements; the insurers set the price, set a commission rate, and downstream parties effectively allocate the value of that commission by their own independent relationships.

One test of Plaintiff's theory is whether Great American has knowledge of the Centennial-Southern Pioneer relationship and whether there were price negotiations that incorporated information about that relationship. In general, Great American has suggested that it has no specific responsive information but in light of Great American's objections, Centennial has no way to confirm that to be true.

The Rule 26 factors also favor production here. The requests were narrowly drawn to seek Great American's knowledge about the negotiations of prices and the contractual relationship between two specific parties *other than* Great American. Accordingly, Great American's objection on the basis of overbreadth and burden is, to be generous, suspect. The requested information is relevant to rebut a fraudulent conspiracy allegation that is front-and-center in the SAC.

> 3. *Requests 6, 16, and 26 concern whether Great American offers qualitatively different policies than the type that Centennial purchased, which is relevant to the interpretation that Centennial obtained an inferior category of FPI policy.*

Requests 6, 16, and 26 assess the potential theory that there are different FPI products, much like health insurance plans on exchanges can be classified as gold, silver, or platinum. If Great American possessed other forms for identical coverage to that at issue here, providing such forms which are publicly available in the marketplace should be a scant burden. This request is relevant because it would test the claim made in the SAC that Centennial choose a "Cadillac" option from Great American's offerings and that Plaintiff was harmed by that choice.

Centennial expects that the likely answer is that there exists only a single form, and that endorsements, attachments, and other components forming the overall insurance contract may vary on a lender-by-lender basis. But given the boilerplate objections from Great American, Centennial cannot assess whether this is true and cannot assess the actual burden on Great American to comply with its requests for highly relevant documents.

4.  *Requests 15, 25, and 25 concern information on competitors' policies and pricing, which is relevant to the allegation that Great American's policies are overpriced compared to competitors.*

These requests mirror request 1 and 5 in being directed to the range of pricing reasonably found in the market but focus on competitors to Great American. Of the three insurers that have provided policies to Centennial, one has exited the market entirely (American Modern, which led to the transition to Great American) and the other (Certain Underwriters at Lloyd's of London) is an affiliation of syndicates unlikely to have access to the same information as Great American, who is an admitted carrier in multiple jurisdictions. Moreover, Centennial as a lender lacks the market knowledge to even identify all relevant competitors. As such, Great American is the least burdensome alternative to seek the information.

The Rule 26 factors should be resolved similarly to requests 1 and 5, except that Centennial does not know enough of Great American's market-intelligence apparatus to know the volume of potential responsive material. The relevance of that material is heightened, as it provides more information on Centennial's range of choices than does material internal to Great American. On balance, therefore, the Rule 26 factors still substantially favor Centennial here.

5.  *All other requests seek limited information on Centennial's policies as compared to other comparable policies that Great American issued, which is relevant to the interpretation that Centennial acquiesced to an inflated rate.*

Keenly aware that the costs charged to individual lender clients would be sensitive commercial information, Centennial has requested only generalized information that would allow the parties to identify how competitive Centennial's prices are among other lenders serviced by Great American.

16

The proposed document requests are not burdensome because each requires only the production of a single pricing/declarations sheet.  Though Great American may claim that locating and isolating only the pricing information requested may be burdensome, Centennial has made other proposals in an attempt to be flexible based on how Great American's data is housed.  On the basis of the objections, however, Centennial is in no better position to assess the level of burden on Great American than when Centennial sent the requests. Moreover, though Great American has made no specific claim of objection based on the confidential nature of the requested information, Centennial has proactively offered on multiple occasions to enter a confidentiality agreement to address any potential concerns. Taken as a whole, the Rule 26 factors again favor Centennial in production of these materials.

## III.    CONCLUSION

The procedural issues warrant a wholesale rejection of any objections raised by Great American and militate in favor of an order compelling full production.  That said, Centennial will continue to negotiate a resolution to this matter (and the related issue of Great American's deposition).  This motion was filed because of the limited remaining discovery period and the need for prompt resolution of the dispute, with Centennial's fact-discovery period expiring in thirty days and the date of this filing being the deadline under the scheduling order to move to compel discovery.

The discovery period in the *Florida Case* has been distorted by the case largely being about the validity of the FPI industry's pricing, framed in the narrower issue of mortgage covenants. With most of the relevant third parties potentially facing an amended complaint, Centennial's

third-party discovery has been thwarted for three critical months and the deadlines to complete discovery loom.

Given this framing and context, Centennial suggests that exceptional circumstances may exist within the meaning of Rule 45(f) to warrant transfer of this matter to the Northern District of Florida.  In addition to the Florida Court's substantial knowledge of the disputed issues, the timing and resolution of discovery disputes may bear significantly on matters of scheduling.


Respectfully submitted,

/s/ Peter J. O'Shea
Peter J. O'Shea (0086560)
Katz Teller Brant & Hild
255 East Fifth Street, Suite 2400
Cincinnati, OH 45202
Telephone:  (513) 721-4532
Facsimile: (513) 977-3401
Email: poshea@katzteller.com

-and-

Keith L. Bell, Jr. (FL Bar 573809)*
Trevor A. Thompson (FL Bar 0068006)*
Clark Partington
215 South Monroe Street, Suite 530
Tallahassee, FL 32301
Telephone: (850) 320-6827
Facsimile: (850) 597-7591
Email: kbell@clarkpartington.com
Email: tthompson@clarkpartington.com

*Motion for admission pro hac vice forthcoming*

**Attorneys for Plaintiff Centennial Bank**

**CERTIFICATION**

I hereby certify that I have conferred in good faith with counsel for Great American in an effort to resolve this matter without court action, but we were unable to resolve the matter to all parties' agreement prior to deadline for Centennial to seek court intervention.

/s/ Trevor A. Thompson
Trevor A. Thompson

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed with the Clerk of the Court using the Court's CM/ECF system on August 11, 2021. I further certify that the foregoing document was in accordance with Fed. R. Civ. P. 5 on August 11, 2021 (via email) and August 12, 2021 (via US Mail) upon:

Alex Potente
Clyde & Co US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Alex.potente@clydeco.us
**VIA ELECTRONIC MAIL AND US MAIL**

Brad Harding
Clyde & Co US LLP
355 S. Grand Avenue, Suite 1400
Los Angeles, CA 90071
Brad.Harding@clydeco.us
**VIA ELECTRONIC MAIL**

Great American Insurance Company
c/o Agent, United Agent Group Inc.
119 E. Court Street
Cincinnati, OH 45202
**VIA US MAIL**

Great American E&S Insurance Company
c/o Agent, United Agent Group Inc.
119 E. Court Street
Cincinnati, OH 45202
**VIA US MAIL**

/s/ Peter J. O'Shea
Peter J. O'Shea (0086560)
  *As to filing*

/s/ Trevor A. Thompson
Trevor A. Thompson
  *As to mail/email service*

20

# EXHIBIT 1

Centennial Bank v. Great American Insurance Company
and Great American E&S Insurance

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| SIMEON PENTON, on behalf of himself and all others similarly situated, | **CASE NO. 4:18-CV-00450-MW-CAS** |
| Plaintiff, | |
| v. | |
| CENTENNIAL BANK, GREAT AMERICAN INSURANCE COMPANY, CERTAIN UNDERWRITERS OF LLOYD'S OF LONDON, OVERBY-SEAWELL COMPANY, and DOES 1-100, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**SECOND AMENDED CLASS ACTION COMPLAINT[1]**

Plaintiff Simeon Penton ("Plaintiff"), by and through his attorneys,

individually and on behalf of all others similarly situated, brings this action upon

---

[1] This Second Amended Class Action Complaint ("Complaint") is filed pursuant to the Order on Motion to Dismiss entered November 22, 2019. ECF No. 56. By filing this amended pleading, Plaintiff does not waive his appellate rights or remedies as to those claims dismissed with prejudice by said Order.

personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, against Defendants Centennial Bank ("Centennial"), Certain Underwriters of Lloyd's of London who are members of Syndicate 623, Syndicate 2623, Syndicate 1200, Syndicate 1225, Syndicate 1969, Syndicate 2000, Syndicate 2001, Syndicate 2003, Syndicate 2121, Syndicate 2488, Syndicate 2791, Syndicate 2987, Syndicate 4020, Syndicate 4472, Syndicate 1886, and Syndicate 6991 (collectively, "Underwriters"), Overby-Seawell Company ("OSC"), and Doe Defendants 1-100 (collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1.     This class action lawsuit seeks redress for injuries resulting directly from Defendants' force-placed insurance practices from 2011 to the present ("Class Period").  Plaintiff, on behalf of a proposed class of borrowers whose residential mortgages are or were held or serviced by Centennial (the "Class"), seeks to recover for the harm he and Class members have suffered as a result of Defendants' wrongful conduct in manipulating the force-placed insurance market.

2.     During the Class Period, Centennial, directly and with the participation and assistance of OSC and Underwriters, and later Great American Insurance Company ("Great American"),[2] manipulated the force-placed insurance process in

---

[2]     The claims against Great American, previously a named defendant (*see* ECF Nos. 1 and 30), have been voluntarily dismissed.  *See* ECF Nos. 50-51.  The

2

violation of mortgage agreements and federal law and in bad faith in order to unjustly enrich themselves in the purchase and placement of force-placed insurance coverage on Plaintiff's and the Class' properties located in Florida and throughout the country.

3.      Centennial's standardized mortgage documents require its borrowers to maintain adequate flood and hazard insurance, and in the event Centennial determines that the borrower fails to do so, Centennial is permitted to "force-place" such insurance and to add the cost of the force-placed insurance to the borrower's mortgage balance or deduct the cost from the borrower's escrow account. Centennial's standardized mortgage documents afford it with substantial discretion to decide whether and how much force-placed insurance is necessary and to select the price and provider of the force-placed insurance coverage.  Centennial exercised this discretion capriciously and in bad faith.

4.      Although Centennial represented to Plaintiff and the Class that it would charge borrowers the "cost" of the force-placed insurance, in reality, Centennial charged borrowers artificially inflated and grossly excessive premiums, a portion of which Centennial either retained or had paid to it by the other Defendants.  These exorbitant premiums, which exceed the actual cost of coverage, can be 10 times higher than the borrower would be charged to obtain the same amount of insurance

_____

Complaint, however, continues to refer to Great American in order to describe the continuing wrongdoing by Centennial and OSC.

on the open market.  Upon information and belief, Centennial did no meaningful work for the sums it received because no individual insurance policy was issued; rather, a master policy provided force-placed coverage for the entire Centennial mortgage loan portfolio.  Therefore, Centennial received undisclosed and unearned kickbacks from OSC and Underwriters, and later Great American, which were designed to encourage referral of business to OSC and Underwriters, and later Great American.

5.    To effectuate this scheme, Centennial entered into undisclosed agreements with OSC and Underwriters, and later Great American, that provided those companies with the exclusive right to monitor the entire Centennial mortgage loan portfolio and/or force-place their own insurance coverage on behalf of Centennial.  Through these agreements, Centennial procured force-placed insurance policies from OSC, who then force-placed insurance on Centennial's behalf through Underwriters, and later Great American.

6.    As part of this scheme, OSC and/or Underwriters, and later Great American, provided Centennial with various kickbacks in exchange for placing the insurance that Defendants disguised as legitimate compensation.  These kickbacks include, but are not limited to, one or more of the following:  (1) unearned "commissions" paid to Centennial for work purportedly performed to procure individual policies; (2) "expense reimbursements" allegedly paid to reimburse

Centennial for expenses it incurred in the placement of force-placed insurance coverage on borrowers; and (3) upon information and belief, free or below-cost mortgage-servicing functions that OSC performs for Centennial that often have nothing to do with the placement of insurance coverage.  Because of these kickbacks, Centennial essentially receives a rebate on the cost of the force-placed insurance. Centennial borrowers, however, ultimately bear the cost of these kickbacks because Defendants do not pass on these rebates to the borrowers.  The charges for force-placed insurance are deducted from borrowers' escrow accounts or added to their loan balances and Defendants attempt to disguise the kickbacks as legitimate when, in fact, they are undisclosed and unearned, unlawful profits that bear no relation to the actual cost of coverage.

7.     These kickbacks, commissions, and subsidized costs were subsumed into the price of the insurance premiums and ultimately paid by the borrowers. Therefore, Defendants had the incentive to charge and collect unreasonably inflated premiums for the force-placed policies.  These artificially inflated premiums greatly exceeded the actual cost of coverage.

8.     Plaintiff does not challenge Centennial's contractual right to obtain force-placed insurance to protect its interests in the properties securing its mortgage loan portfolio, but instead challenges the manner in which Defendants have manipulated the force-placed insurance process to enrich themselves at the expense

5

of Plaintiff and the Class, and in violation of the mortgage agreements and federal law.

9.     Accordingly, Plaintiff brings this action on behalf of himself and the Class to recover damages arising from Centennial's breach of contract, and breach of the implied covenant of good faith and fair dealing. Plaintiff also seeks to recover in restitution all excessive amounts that were paid to and unjustly enriched OSC and Underwriters.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d) ("CAFA"). The aggregated claims of the individual class members exceed the sum or value of $5,000,000 exclusive of interest and costs; there are more than 100 putative class members defined below; and minimal diversity exists because Plaintiff is a citizen of a different state than Defendants. Plaintiff is a citizen of Alabama who owned real property in Franklin County, Florida, during the Class Period; Centennial is a citizen of Arkansas, each Underwriter is a foreign citizen of the United Kingdom, and OSC is a citizen of Georgia.

11.     This Court has personal jurisdiction over Defendants because they are foreign corporations authorized to conduct business in Florida, each of which regularly conducts business in Florida and, therefore, have sufficient minimum

contacts with Florida and/or intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this district pursuant to 28 U.S.C. §1391 because Defendants are subject to personal jurisdiction in this district, regularly transact business in this district and, therefore, are deemed citizens of this district. Additionally, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

13. All conditions precedent to this action have occurred, been performed, or have been waived.

## **PARTIES**

14. Plaintiff Simeon Penton is a citizen of Alabama. During the Class Period, Plaintiff owned real property located in the Mariner's View Condominiums, 703-C SE 3rd Street, Unit 3, Carrabelle, Franklin County, Florida (the "Property"). Beginning in 2005, Plaintiff entered into a series of loans with Gulf State Community Bank secured by a real estate mortgage dated September 7, 2005 (the "Mortgage") on the Property. Plaintiff's Mortgage was later acquired by and/or

transferred to Centennial when Centennial acquired Gulf State Community Bank through the Federal Deposit Insurance Corporation ("FDIC") in 2010. On or about June 26, 2018, Plaintiff sold the Property and the Mortgage was satisfied.

15.     Defendant Centennial is headquartered in Conway, Arkansas and maintains approximately 88 branches in Florida, and approximately 90 branches elsewhere throughout the United States. Centennial, a wholly owned subsidiary of Home BancShares, Inc. ("HBS"), has more than $10 billion of deposits and more than $14 billion of assets. Among other things, Centennial originates mortgage loans and services its own mortgage loan portfolio. During the Class Period, Centennial owned and held the Mortgage on the Property and force-placed flood and hazard insurance on the Property as well as on other properties subject to any mortgage it held or serviced.

16.     Defendant Certain Underwriters of Lloyd's of London ("Lloyd's") is a foreign business entity headquartered at One Lime Street, London, England with administrative offices in the United States located at 42 West 54th Street, 14th Floor, New York, New York, 10019. Lloyd's is an organization that provides insurance underwriting services and is comprised of separate syndicates that underwrite insurance in an insurance marketplace known as Lloyd's of London. According to A.M. Best's Special Report on Surplus Lines, in 2016 Lloyd's was the largest surplus lines insurer in the United States with approximately 22.6% of the U.S.

surplus lines market, accounting for approximately $9.6 billion direct surplus lines premium written.  Upon information and belief, Lloyd's serves as the registered legal agent in the United States for each Underwriter.

17.    According to the Florida Office of Insurance Regulation ("FLOIR"), Lloyd's, which includes all Lloyd's syndicates, are authorized to sell surplus lines property and casualty insurance in Florida.  Lloyd's and its syndicates, such as Underwriters, offer surplus lines insurance in Florida by placing insurance through a network of surplus lines brokers, such as OSC.  As surplus lines insurers, Underwriters are not required to file rates with the state insurance regulators, and their rates and forms are not approved by any Florida regulatory agency. Underwriters each issued force-placed insurance on the Property during the Class Period.

18.    For any given force-placed insurance master policy issued, one or more syndicates authorized to operate in the Lloyd's of London insurance market subscribes to and underwrites the policy.  Based on documents filed by Centennial in connection with its motion to dismiss (ECF Nos. 38-4 to 38-8), the identity of some, but not all, of the syndicate(s)[3] that subscribed to and underwrote the force-placed insurance policies that are the subject of this lawsuit are now known.

---

[3]    Centennial could not locate the master policies for all relevant years and therefore certain syndicates are still unknown.  *See* ECF No. 30 at n.2.

19.     Defendant Lloyd's Syndicates 623 and 2623 are managed by Beazley Furlonge Ltd ("Beazley"). Beazley is a foreign business entity headquartered at Plantation Place South, 60 Great Tower Street, London, England.   Beazley established Syndicate 2623 to underwrite in parallel with Syndicate 623.   Within these two Syndicates, all business is split: Syndicate 2623 (82%), Syndicate 623 (18%).[4] Syndicates 623 and 2623 subscribed to and underwrote part of the insurance for Master Policy No. FLD20010831-647 for the period of October 1, 2011 to October 1, 2012 ("2011-2012 Master Policy"), pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties.  *See* ECF No. 38-4.

20.     Defendant Lloyd's Syndicate 1200 is managed by Argo Managing Agency Limited ("Argo").  Argo is a foreign business entity headquartered at 1 Fen Court, London, England.  Syndicate 1200 subscribed to and underwrote part of the insurance for the 2011-2012 Master Policy and Current Policy No. 12BKS1033255F for the period of May 1, 2012 to May 1, 2013 ("2012-2013 Master Policy"), pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties.  *See* ECF Nos. 38-4, 38-5.

21.     Defendant Lloyd's Syndicate 1225 is managed by AEGIS Managing Agency Limited ("AEGIS").  AEGIS is a foreign business entity headquartered at

---

[4]     https://www.beazley.com/london_market/beazley_at_lloyds_london_market (last visited Dec. 4, 2019).

33 Gracechurch Street, London, England.  Syndicate 1225 subscribed to and underwrote part of the insurance for the 2011-2012 Master Policy and the 2012-2013 Master Policy, pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties.  *See* ECF Nos. 38-4, 38-5.

22.    Defendant Lloyd's Syndicate 1969 is, or was, managed by ANV Syndicates Limited ("ANV"), a foreign business entity headquartered at 47 Mark Lane, London, England.  Syndicate 1969 subscribed to and underwrote part of the insurance for the 2011-2012 Master Policy, pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties.  *See* ECF No. 38-4.

23.    Defendant Lloyd's Syndicate 2000 is, or was, managed by QBE Underwriting Limited, a foreign business entity headquartered at Plantation Place, 30 Fenchurch Street, London, England.   Syndicate 2000 subscribed to and underwrote part of the insurance for the 2011-2012 Master Policy, pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties.  *See* ECF No. 38-4.

24.    Defendant Lloyd's Syndicate 2001 is  managed  by  MS Amlin Underwriting Limited ("Amlin").  Amlin is a foreign business entity headquartered at The Leadenhall Building, 122 Leadenhall Street, London, England.  Syndicate 2001 subscribed to and underwrote part of the insurance for the 2011-2012 Master

Policy, pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties. *See* ECF No. 38-4.

25. Defendant Lloyd's Syndicate 2003 is managed by Catlin Underwriting Agencies Limited ("Catlin"). Catlin is a foreign business entity headquartered at 20 Gracechurch Street, London, England. Syndicate 2003 subscribed to and underwrote part of the insurance for the 2011-2012 Master Policy, pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties. *See* ECF No. 38-4.

26. Defendant Lloyd's Syndicate 2121 is managed by Argenta Syndicate Management Limited ("Argenta"). Argenta is a foreign business entity headquartered at 70 Gracechurch Street, 5th Floor, London, England. Syndicate 2121 subscribed to and underwrote part of the insurance for the 2011-2012 Master Policy and the 2012-2013 Master Policy, pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties. *See* ECF Nos. 38-4, 38-5.

27. Defendant Lloyd's Syndicate 2488 is, or was, managed by ACE Underwriting Agencies Limited, a foreign business entity headquartered in London, England. In 2016, ACE Underwriting Agencies Limited was renamed to Chubb Underwriting Agencies Limited ("CUAL"). CUAL is a foreign business entity located in London, England. Syndicate 2488 subscribed to and underwrote part of the insurance for the 2011-2012 Master Policy and the 2012-2013 Master Policy,

pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties. *See* ECF Nos. 38-4, 38-5.

28. Defendant Lloyd's Syndicate 2791 is managed by Managing Agency Partners Limited ("MAP"). MAP is a foreign business entity headquartered at Fitzwilliam House, 10 St. Mary Axe, London, England. Syndicate 2791 subscribed to and underwrote part of the insurance for the 2011-2012 Master Policy, pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties. *See* ECF No. 38-4.

29. Defendant Lloyd's Syndicate 2987 is managed by Brit Syndicates Limited ("Brit"). Brit is a foreign business entity headquartered at The Leadenhall Building, 122 Leadenhall Street, London, England. Syndicate 2987 subscribed to and underwrote part of the insurance for the 2011-2012 Master Policy and the 2012-2013 Master Policy, pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties. *See* ECF Nos. 38-4, 38-5.

30. Defendant Lloyd's Syndicate 4020 is managed by Ark Syndicate Management Limited ("Ark"). Ark is a foreign business entity headquartered at 30 Fenchurch Avenue, London, England. Syndicate 4020 subscribed to and underwrote part of the insurance for the 2011-2012 Master Policy, pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties. *See* ECF No. 38-4.

31.     Defendant Lloyd's Syndicate 4472 is managed by Liberty Managing Agency Limited ("Liberty").  Liberty is a foreign business entity headquartered at 20 Fenchurch Street, London, England.  Syndicate 4472 subscribed to and underwrote part of the insurance for the 2011-2012 Master Policy, pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties.  *See* ECF No. 38-4.

32.     Defendant Lloyd's Syndicate 1886 is managed by QBE Underwriting Limited. ("QBE").  QBE is a foreign business entity headquartered at Plantation Place, 30 Fenchurch Street, London, England.  Syndicate 1886 is a trading unit of Syndicate 2999.[5]  Syndicate 1886 subscribed to and underwrote part of the insurance for the 2012-2013 Master Policy, pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties.  *See* ECF No. 38-5.

33.     Defendant Lloyd's Syndicate 6991, upon information and belief, is, or was, managed by R&Q Managing Agency Limited ("RQMA"), a foreign business entity headquartered in London, England.  In 2017, RQMA was renamed as Coverys Managing Agency Limited, a foreign business entity headquartered at One Creechurch Place, London, England.  Syndicate 6991 subscribed to and underwrote part of the insurance for Current Policy No. DTW010BIS2013002F for the period of May 1, 2014 to May 1, 2015 ("2014-2015 Master Policy") and Current Policy No.

---

[5]     https://qbeeurope.com/about-us/qbe-at-lloyds/ (last visited Dec. 4, 2019).

DTW010BIS2014006F for the period of May 1, 2015 to May 1, 2016 ("2015-2016 Master Policy"), pursuant to which Centennial force-placed flood insurance on Plaintiff's and the Class' properties. *See* ECF Nos. 38-6, 38-7.

34.     Each Underwriter resides in London, England, and is a foreign agent of undisclosed principals.

35.     All of the Underwriters are eligible to write surplus insurance in the United States.[6]

36.     Defendant OSC is headquartered in Kennesaw, Georgia, and maintains an office in Florida.  OSC provides insurance brokerage and placement services to financial institutions.  OSC, a subsidiary of Breckenridge Insurance Group Inc., represents that it is a leading provider of compliance-driven tracking technology and insurance products and services for lenders, mortgage servicers, and property investors to deliver fully integrated property insurance programs to some of the largest lenders in the country.  OSC actively participates in the force-placed insurance market and openly markets its compliance-driven tracking technology and insurance products for lenders, mortgage servicers, and property investors.  OSC's website advertises its proprietary IrisX software tracking system.  According to its

---

[6]     *See*    http://www.lloyds.com/lloyds/offices/americas/us-homepage/about-us ("Underwriters at Lloyd's . . . are approved surplus lines insurers in all US states and territories. . . . Lloyd's is the largest surplus lines insurer in the US[.]") (last visited Dec. 4, 2019).

website content, OSC, through IrisX, provides its bank clients (including Centennial) with insurance tracking, coverage ordering, robust search and reporting, and consumer-compliant communications capabilities. OSC's website content goes on to state that it is intimately aware of its customers' data, offering them "[t]ailored technology, compliance, and reporting options coupled with comprehensive coverage."[7] OSC also is an authorized "coverholder" in the Lloyd's market.[8] During the Class Period, insurance was force-placed on the Property with Underwriters through OSC as an authorized coverholder.

37.    Doe Defendants 1-100 are those insurance brokers, agents, and/or coverholders that selected the insurance that was force-placed on Plaintiff's and the Class' properties as well as those Lloyd's syndicate(s) and/or other insurers that underwrote the various force-placed policies that are the subject of this lawsuit. Plaintiff will be able to identify the Doe Defendants through discovery of Plaintiff's loan file, the Master Policy, and agreements between Defendants.

---

[7]     *See* https://www.oscis.com/insurance/property/lender-placed/ (last visited Dec. 4, 2019).

[8]     According to the Lloyd's website: "'Coverholder' means a company or partnership authorised by a Managing Agent to enter into a contract or contracts of insurance to be underwritten by the members of a syndicate managed by it in accordance with the terms of a Binding Authority," which "is an agreement between a Managing Agent and a Coverholder . . . setting out the extent and terms of the Coverholder's delegated authority [.]" *See* https://www.lloyds.com/market-resources/delegated-authorities/compliance-and-operations/about-coverholders (last visited Dec. 4, 2019).

## OTHER RELEVANT NON-PARTY

38.     Great American is headquartered in Cincinnati, Ohio, and maintains an office in Florida.  Great American, a wholly owned subsidiary of American Financial Group, provides property and casualty insurance products, including surplus lines insurance in Florida and elsewhere throughout the United States.  Surplus line insurance carriers do not file their insurance rates with state insurance regulators, and therefore, Great American's rates (and the ultimate insurance premiums) are not reviewed or approved by state insurance regulators.  As of March 31, 2016, Great American reported to FLOIR that it had $1,608,696,535 in reported surplus and an underwriting gain of $77,712,694.[9]   Great American issued the force-placed insurance on the Property for the period July 2016 to July 2018.  *See* ECF Nos. 38-9, 38-10.

## TOLLING OF STATUTES OF LIMITATIONS

39.     The applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Plaintiff and members of the Class could not have reasonably discovered the true, latent nature of the aforementioned facts relating to Defendants' force-placed insurance practices until shortly before this class action litigation was commenced.  As a result of

---

[9]      *See*   https://www.floir.com/siteDocuments/SignificantWriters03312016.pdf (last visited Dec. 4, 2019).

Defendants' active concealment, all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

### A. THE FORCE-PLACED INSURANCE PROCESS

40. Force-placed insurance policies are generally meant to protect a mortgagee's interest in the borrower's property when the borrower's insurance policy has lapsed. Mortgage servicers, insurance agents or brokers, and insurers, however, have turned the force-placed insurance process into a fraudulently inflated profit-making machine for themselves at the expense of borrowers. The charges mortgage servicers impose on borrowers, and falsely attribute to the "cost" of the force-placed insurance, are at least five to six times, and often up to 10 times, more than what the borrower was either paying originally for homeowner's insurance or what the borrower could obtain for voluntary insurance on the open market.

41. Mortgage servicers are companies that contract with the owners/investors of residential mortgage loans to administer those loans on behalf of the owners/investors. The mortgage servicers' responsibilities include maintaining the property insurance in place to minimize the exposure to uninsured loss. Mortgage servicers procure force-placed insurance contracts through an insurance agent or broker to have coverage available should there be a lapse in a

borrower's property insurance.  Mortgage originators also may service their own mortgage loan portfolios, as Centennial does.

42.    An insurance agent or broker fulfills several roles.  It represents the mortgage servicer in procuring force-placed insurance from insurers.  It is also an agent to insurers in placing their insurance products with the mortgage servicers who purchase the insurance.  An insurance agent or broker may also serve as an insurance administrator, using proprietary insurance tracking systems to monitor the loan portfolio to detect lapses in coverage, communicate with borrowers regarding insurance coverage issues, and place the insurer's coverage on the mortgage servicer's portfolio properties.

43.    Mortgage servicers delegate their responsibility for communications with borrowers to their insurance administrator.  However, the mortgage servicer is required to maintain managerial oversight, control, and regulatory responsibility over the insurance administration process, including the review and approval over the content of communications sent to borrowers.  The work of the insurance administrator is not apparent to the borrower.  For example, the insurance administrator typically mails communications to the borrower under the letterhead of the mortgage servicer.

44.    The providing of loan tracking and portfolio monitoring services is properly the function of the mortgage servicer, not the insurance administrator.

19

Indeed, it is the responsibility and function of the mortgage servicer to service the mortgages in its portfolio and adhere to federal regulations governing mortgage servicing. Third party vendors are not authorized to service mortgages, nor are they held accountable for compliance with federal regulations. Moreover, although the mortgage tracking services are performed for the entire mortgage loan portfolio, the cost of these services is imposed only on those unfortunate borrowers with the force-placed policies.

45. The duties among these entities are set forth in interlocking written agreements between the mortgage servicer, the agent/broker, the insurance administrator, and the insurer. These agreements define, among other things, the duties of the agent/broker in procuring and placing the insurance and the duties of the insurance administrator in providing the loan tracking services, providing written notices to borrowers regarding the placing of insurance on borrowers' properties, and the handling of insurance claims and reports that will be provided to the mortgage servicer. These agreements also define the premium structure and the commission structure for the insurance placed and the services provided.

46. Through this series of interlocking agreements, mortgage servicers are paid unearned commissions or kickbacks from the force-placed insurance provider companies, often through the insurance broker, once the high-priced, force-placed insurance coverage is placed on a borrower's property.

47.    Therefore, mortgage servicers consistently choose force-placed insurance arrangements that reward themselves at the expense of the borrowers.  The National Association of Insurance Commissioners stated that mortgage servicers "have no incentive to select a competitively priced product" but instead would select one "where they are provided with an incentive or inducement to enter into the transaction."[10]

48.    Endemic to the force-placed insurance industry are the outsized and unconscionable profits, which the mortgage servicers, insurance agents/brokers, and insurers reap through exorbitant premiums and kickbacks, all at the expense of the unsuspecting borrower.  The American Banker reported that "force-placed policies generate profit margins unheard of elsewhere in the insurance industry even after accounting for the generous commissions and other payments that servicers demand."[11]

49.    When the force-placed policies involve regulated insurance providers, as opposed to unregulated surplus lines insurance providers named as Defendants here, state regulators across the nation have taken action to curb the abuses systemic in the force-placed insurance industry.  Indeed, following an investigation by the

---

[10]    *See* J. Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, AM. BANKER (Nov. 9, 2010), https://www.americanbanker.com/news/ties-to-insurers-could-land-mortgage-servicers-in-more-trouble.

[11]    *Id.*

FLOIR into the rate filing and business practices of American Security Insurance Company, the FLOIR entered into a consent order against the company requiring it to change certain business practices including: notifying all borrowers about alternative options available for force-placed insurance coverage; prohibiting the payment of commissions to a mortgage servicer on force-placed insurance policies obtained by that servicer; prohibiting the payment of contingent commissions based on underwriting profitability or loss ratios; prohibiting the issuance of force-placed insurance policies on mortgaged property serviced by an affiliate; prohibiting the provision of free or below-cost outsourced services to a mortgage servicer; and, prohibiting the payment of any incentive to a mortgage servicer as an inducement to secure force-placed insurance business.[12]   The consent order further required American Security Insurance Company to decrease its rates by 10%, or $51 million.

50.    As discussed below, the actions of Centennial (as the mortgage servicer), OSC (as the insurance broker and insurance administrator), and Underwriters, and later Great American, (as the insurers) track the foregoing standard paradigm of manipulation of the force-placed insurance process.  The inflated premiums and other charges Centennial imposes on borrowers for force-placed insurance coverage, which Centennial obtains from Underwriters, and later

---

[12]     Consent Order, *In the Matter of: American Sec. Ins. Co.*, Case No. 141841-13, FLOIR (Oct. 7, 2013), https://www.floir.com/siteDocuments/AmericanSecurity141841-13-CO.pdf.

Great American, through its broker OSC, are excessive and beyond the actual cost of coverage. Centennial's charges imposed on Plaintiff and attributed to the "cost" of force-placed insurance coverage it obtained from Underwriters, and later Great American, through OSC and placed on Plaintiff's Property were approximately **10 times more expensive** than the flood insurance coverage Plaintiff's condominium association placed on the Property. Indeed, the premium Underwriters calculated for the force-placed insurance on the Property was approximately twice as expensive as voluntary flood insurance available in Florida through the Lloyd's market's surplus lines business.[13] The result of this scheme was to create an inflated trough of premiums for Defendants to gorge themselves on through a series of kickbacks and inflated fees.

## B.   DEFENDANTS' KICKBACK SCHEME

51.   Under the mortgage with Plaintiff and other borrowers, Centennial is given discretion to obtain necessary insurance and charge the borrower the "cost" of the necessary insurance. Defendants exploited this discretion by entering into interlocking agreements, the goal of which was to create a trough of inflated profits that would be shared among themselves in the form of unlawful kickbacks,

---

[13]   *See* Susan Taylor Martin, *Lloyd's of London dramatically lowers its flood insurance rates in Florida*, TAMPA BAY TIMES (April 17, 2014), https://www.tampabay.com/news/business/banking/lloyds-of-london-dramatically-lowers-its-flood-insurance-rates-in-florida/2175614/.

additional service fees, and incremental profits obtained through net written insurance premiums.

52. Each Defendant played an integral role in force placing insurance on properties owned by Plaintiff and the Class:

a. Centennial, as part of its mortgage servicing duties, controlled the right to force-place insurance on the properties of borrowers whose loans it serviced. It also had the authority to charge borrowers for the "cost" of the force-placed insurance imposed on their property under the terms of the mortgage with the borrower.

b. OSC, as an insurance broker, represented Underwriters (and later Great American), whose force-placed insurance products were sold to Centennial and placed on borrowers' properties in the Centennial loan portfolio. OSC earned commissions on the placement of Underwriters' (and later Great American's) coverage on borrowers' properties in the Centennial loan portfolio.

c. OSC, as an insurance administrator, also provided loan tracking services to monitor Centennial's mortgage loan portfolio for lapses in insurance, communicate with borrowers concerning insurance coverage issues, and place insurance on properties where insurance had lapsed. OSC operated as an extension of Centennial and communicated with borrowers in

the name of Centennial. OSC earned incremental fee income from providing insurance tracking services to Centennial.

  d.  Underwriters (and later Great American) are insurers that subscribed to and/or underwrote the force-placed surplus lines insurance policies provided to Centennial through OSC, in exchange for premiums, which were artificially inflated.

53. Centennial entered into an agreement with OSC pursuant to which OSC was appointed the agent for Centennial in procuring force-placed insurance for Centennial's purchase. Upon information and belief, OSC agreed that in exchange for Centennial selecting OSC as its insurance broker, OSC would credit or remit a kickback to Centennial in the form of unearned "commission" payments calculated as a percentage of net written premium of insurance coverage placed on borrowers' properties in the Centennial loan portfolio.

54. OSC entered into an agreement with Underwriters (and later Great American) that it would act as its agent in placing its force-placed surplus lines insurance with Centennial. Pursuant to this agreement, OSC and Underwriters (and later Great American) agreed that OSC receives a commission from Underwriters (and later Great American), as a percentage of the total net written premium of force-placed policies on the Centennial loan portfolio. Upon information and belief, OSC

will then kick back a portion of its commission to Centennial as an inducement for selecting insurance from Underwriters (and later Great American).

55. OSC entered into an agreement with Centennial to serve as Centennial's insurance administrator. Pursuant to the agreement, it provided loan tracking services to monitor Centennial's loan portfolio for lapses in insurance, communicated with borrowers concerning insurance, coverage issues, and placed insurance on properties where insurance had lapsed. Upon information and belief, these services were provided at nominal or below cost.

56. Centennial obtained unearned "commission" kickbacks and the value of discounted loan monitoring services provided by OSC by imposing on Plaintiff's and other borrowers' mortgage accounts charges falsely attributed to the "cost" of the force-placed insurance, but which were inflated to include the unearned "commission" kickbacks and the value of discounted loan services. The servicing costs are added into the force-placed premiums, which are then passed on to the borrowers. The insurers are able to provide these services at below cost because of the enormous profits they make from the hyper-inflated premiums charged for force-placed insurance. However, because insurance-lapsed mortgaged property or allegedly under-insured mortgaged property typically comprises a very small percentage, sometimes only 1%-2%, of the lenders' total mortgage portfolio, the borrowers who pay these premiums unfairly bear the entire cost to service the entire

loan portfolio. These kickbacks are directly tied to the price of the force-placed insurance coverage and are usually a percentage of the total net written premium of a policy.

57. This arrangement provides Centennial with an incentive to purchase the highest priced force-placed insurance policy that it can because the higher the cost of the insurance policy, the higher the unearned commission or kickback to the mortgage servicer.

58. Plaintiff does not dispute that Centennial is entitled under Plaintiff's mortgage to purchase force-placed insurance when a lapse in coverage actually occurs; however, Plaintiff does maintain that said purchase must be made in good faith, without bad motive, and in compliance with the mortgage terms.

59. Plaintiff challenges the manipulative and unjust method used to select and place the policies, which is a result of illegal kickbacks, unearned commissions, and inflated and improper bundled servicing charges, in violation of mortgage agreements and federal law.

60. Pursuant to rights granted to Centennial under its standard mortgage documents, it is authorized to obtain insurance coverage to protect its rights in the mortgaged property, if it determines that the borrower has failed to adequately insure the property. The cost of the premium for the force-placed insurance is not set forth in the mortgage contract.

61.    Centennial, through OSC, notifies borrowers by mail that Centennial will charge the cost of the premium and fees incurred in purchasing the insurance to the borrower's loan balance.  Centennial, through OSC, also notifies borrowers that the cost of the force-placed insurance may be higher than the premium the borrower could obtain for voluntary insurance on the open market and that the force-placed insurance coverage may not be sufficient to cover the borrower's full interest in the property.

62.    However, neither the mortgage contract nor any subsequent notice inform the borrower that Centennial will charge grossly excessive premiums beyond the actual cost of coverage or that it will receive unearned commissions and/or kickbacks from OSC and/or Underwriters (or later Great American) for purchasing the force-placed insurance from them.  Nor is it disclosed to the borrower that unearned commission fees and/or kickbacks simply will be based upon a percentage of the cost of the premium of the force-placed insurance.  Instead, the mortgage servicer misrepresents to borrowers that the cost of the force-placed insurance may be higher due to the "risk" the borrower poses, or the actual costs incurred in securing the policies.  Upon information and belief, however, there are little to no actual costs in securing the policies, and little to no underwriting takes place.  In the case of Centennial, this is because it purchases a master, or "umbrella," policy that covers the entire Centennial portfolio of mortgage loans.

63.   The mortgage documents also do not explain that Centennial will charge borrowers fees purportedly associated with procuring and placing the force-placed insurance, although Centennial claims that it incurs fees or expenses in locating the force-placed insurance for the individual borrower.  Upon information and belief, the so-called "expenses" Centennial incurs are next to nothing.  Indeed, Centennial has pre-existing relationships with OSC and Underwriters (and later Great American), which have been prearranged under a master or umbrella policy for the entire Centennial loan portfolio.  Rather than issue a specific, individual policy for each property where force-placed insurance is placed, OSC and Underwriters (and later Great American) simply add the subject property to a master policy that covers the entire Centennial mortgage loan portfolio.

64.   This unearned commission or kickback structure encourages Defendants to select the most expensive insurance policy, despite not having an interest in the insured collateral.

65.   Centennial charges Plaintiff and Class members the full inflated amount of the overpriced force-placed insurance coverage, which includes the unearned commissions, and the value of below cost or discounted loan tracking services, and other kickbacks from OSC.  When Centennial adds the high-priced premium cost to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.  Ultimately, it is the

unsuspecting homeowner who suffers the consequences of these unjust practices that are violative of the mortgage agreements and federal law.

66.    Defendants' unlawful actions include, *inter alia,* their agreeing to a scheme that involved:  (a) Centennial, OSC, and Underwriters (and later Great American) entering into a series of interlocking agreements, for the purpose of inducing Centennial to procure unconscionably high-priced insurance policies through its agent, OSC, from Underwriters (and later Great American) and charging artificially inflated premiums that were approximately 10 times greater than comparable insurance in the open market to Plaintiff's and other borrowers' mortgage accounts; (b) Centennial entering into an exclusive relationship with OSC for the placement of force-placed insurance policies on the Centennial mortgage loan portfolio; (c) Centennial receiving unearned "commissions" and low-cost or no-cost loan tracking and loan monitoring services from OSC, in exchange for Centennial's agreement to use OSC as its exclusive force-placed insurance broker; (d) OSC entering into agreements with Underwriters (and later Great American) to be the exclusive force-placed insurance providers for the Centennial loan portfolio, and pursuant to which OSC and Underwriters (and later Great American) agreed that OSC would receive a commission from Underwriters (and later Great American) as a percentage of the total net written premium of force-placed policies on the Centennial loan portfolio, and then kick back a portion of the commission to

Centennial as an inducement for selecting Underwriters' (and later Great American's) insurance; (e) Centennial obtaining unearned "commission" kickbacks and the value of discounted loan monitoring services by imposing on Plaintiff's and other borrowers' mortgage accounts charges attributed to the "cost" of the force-placed insurance, but which were inflated to include the unearned "commission" kickbacks and the value of discounted loan services; and (f) Underwriters (and later Great American) receiving from Plaintiff and Class members inflated premium amounts that bear no relation to the actual cost of providing coverage.

67.     Specifically, the evidence of insurance coverage documentation sent to Plaintiff and Class members states that the property owner is responsible for the insurance charges for the force-placed coverage and states a total premium amount.[14] Centennial automatically charges Plaintiff and Class members the inflated premium amount by either deducting the amount from their escrow accounting or adding the amount to their mortgage balance. Centennial remits the inflated premium amount to OSC, and OSC then remits the inflated premium amount to Underwriters after it deducts its commission (which is based on a percentage of the total net written premium of force-placed policies on the Centennial loan portfolio). Underwriters (and later Great American) then pays OSC a contingent commission, which is

---

[14]     *See*, *e.g.*, ECF No. 38-10 at 2 ("Please be aware that you will be responsible for the insurance charges for this coverage.").

inflated because the total premium is artificially inflated. And, OSC pays Centennial a kickback.

68. As a result, each of the Defendants is unjustly enriched as follows (although Centennial is not being sued here for unjust enrichment), all of which is rooted in the inflated premium amount paid by Plaintiff (and other Class members):

a. Centennial receives an inflated premium directly from Plaintiff, and a kickback from OSC;

b. OSC receives an inflated commission on the inflated premium that Centennial receives from Plaintiff, as well as an artificially inflated contingent commission from Underwriters; and

c. Underwriters then receives the inflated premium amount via OSC that directly flows from the inflated premium paid by Plaintiff (and other Class members) to Centennial.



69.     Defendants' manipulation of the force-placed insurance process has maximized the profits to themselves to the great detriment of Plaintiff and the Class. Defendants were not and are not, authorized by any federal, state, or local governing body, contract, or agreement to manipulate their force-placed insurance purchases in bad faith and unconscionable practices.  Defendants' exclusive arrangement is in place solely to maximize their profits through the manipulation of the force-placed market by charging grossly excessive premium prices and collecting unjustified kickbacks or other compensation, in violation of the mortgage agreements and federal law.

## C.     PLAINTIFF SIMEON PENTON

70.     On or about September 2005, Plaintiff purchased the Property.  Plaintiff initially financed the purchase of the Property through Gulf State Community Bank with a two-year, interest-only note in the amount of $200,000 secured by the Mortgage on the Property.

71.     On or about October 2007, Gulf State Community Bank renewed the initial note and Mortgage for a period of 12 months.  On or about September 2008, Gulf State Community Bank renewed the loan again, this time under a standard 30-year note secured by the Mortgage on the Property.  The total amount financed was $200,000.

72.     On or about February 2010, Plaintiff refinanced the 2008 note with Gulf State Community Bank and entered into a 30-year note in the amount of $191,424.43 secured by the Mortgage on the Property.

73.     On November 19, 2010, Gulf State Community Bank was closed by the Florida Office of Financial Regulation and the FDIC was named as Receiver.

74.     The FDIC thereafter entered into a purchase and assumption agreement with Centennial whereby Centennial assumed and purchased all of the assets of Gulf State Community Bank, including the 2010 note and the Mortgage encumbering the Property.

75.     Plaintiff was obliged to maintain flood and hazard insurance on the Property as a condition of the Mortgage.  The Mortgage provides:

> 19.  **Insurance**.  Mortgagor shall keep Property insured against loss by fire, flood, theft, and other hazards and risks reasonably associated with the Property due to its type and location.  This insurance shall be maintained in the amounts and for the periods that the Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt.  The insurance carrier providing the insurance shall be chosen by the Mortgagor subject to the Lender's approval, which shall not be unreasonably withheld.  If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

76.     As an owner of one of the units at Mariner's View Condominiums, Plaintiff became a member of the condominium association.  The condominium association purchased hazard and flood insurance for all of the condominium units,

including Plaintiff's Property. Specifically, Plaintiff's condominium association policy provided hazard insurance as well as $125,000 in flood insurance for the Property during the entirety of the Class Period, without any lapse in coverage.

77. Beginning in 2011 through 2018, Centennial, through the participation and assistance of OSC and Underwriters (and later Great American), began force-placing flood and hazard insurance on the Property and applying the related charges to the balance of Plaintiff's Mortgage. To date, force-placed insurance has been placed 11 times on the Property.

78. The insurance force-placed on the Property was a surplus lines policy, the rates of which were not filed with or approved by the FLOIR. Specifically, the FLOIR notes that "Surplus lines insurance companies do not file rates and forms with the Office."[15] Therefore, Defendants' conduct alleged herein concerning improperly force-placing insurance is not regulated by FLOIR.

79. During the Class Period, Centennial, or OSC and Underwriters (and later Great American), on behalf of Centennial, sent letters on Centennial letterhead to Plaintiff that represented that Plaintiff purportedly had insufficient flood and/or hazard insurance on the Property and that additional insurance would be force-placed and charged to Plaintiff. OSC and Underwriters (and later Great American)

---

[15]    *See* https://www.floir.com/Sections/PandC/FloodInsurance/
FloodInsuranceWritersFL.aspx (last visited Dec. 4, 2019).

provided Plaintiff with the notice of coverage setting forth the amount of insurance force-placed through Underwriters (and later Great American) as insurer as well as the amount of premium charged to Plaintiff for this additional, force-placed insurance.

80.     For example, a letter on Centennial letterhead dated November 27, 2015, represented to Plaintiff that the flood insurance coverage on the Property was insufficient, stating: "Your current policy has coverage in the amount of $125,000, but our guidelines require that you carry at least $195,800. You must carry the required coverage or we will be required to force place the difference. . . . The bank will charge the cost of the premium and fee incurred in purchasing the insurance to your loan balance."

81.     In conjunction with the November 27, 2015 letter, Plaintiff received a certificate of insurance, stating that "THE MORTGAGEE [*i.e.*, Centennial] HEREBY CERTIFIES THAT IT HAS PLACED FLOOD INSURANCE ON THE MORTGAGED PROPERTY WITH CERTAIN UNDERWRITERS OF LLOYD'S, LONDON THROUGH COVERHOLDER BRECKENRIDGE INSURANCE SERVICES LLC AND OVERBY-SEAWELL COMPANY." The certificate of insurance was prepared on November 16, 2015 and stated that the coverage period was from November 16, 2015 to November 16, 2016 or until cancelled, that the coverage limit was $195,800.00, and that the total premium was $3,394.25. Thus,

instead of force-placing the difference between $195,800 (the amount of flood insurance coverage that Centennial claimed was required) and $125,000 (the amount of flood insurance coverage that Centennial acknowledged in its November 27, 2015 letter was maintained on the Property), Centennial improperly force-placed the full amount of the purportedly required flood insurance coverage of $195,800.

82. After receiving the notice of forced placement of flood insurance, Plaintiff called Centennial in either its Apalachacola, Florida branch or its Carabelle, Florida branch and disputed the need for this flood insurance, informing Centennial that he already had flood insurance coverage on the Property through the Mariner's View Condominium Association. Plaintiff also called the Mariner's View Condominium Association and had them send directly to Centennial evidence of flood insurance on the Property. Thereafter, OSC and/or Underwriters issued to Plaintiff a notice of flood cancellation "at the request of you or your insured mortgagee," refunding Plaintiff the full amount of total premium added to his loan balance. This notice of cancellation was prepared on January 12, 2016.

83. Then, a letter on Centennial letterhead dated January 14, 2016, represented to Plaintiff that the flood insurance coverage on the Property still was insufficient, stating: "Your current policy has coverage in the amount of $125,000, but our guidelines require that you carry at least 100% RCV [Replacement Cost Value] of $200,000. You must carry the required coverage or we will be required

to force place the difference. . . . The bank will charge the cost of the premium and fee incurred in purchasing the insurance to your loan balance."

84. Thereafter, Plaintiff received a certificate of insurance, stating that "THE MORTGAGEE [*i.e.*, Centennial] HEREBY CERTIFIES THAT IT HAS PLACED FLOOD INSURANCE ON THE MORTGAGED PROPERTY WITH CERTAIN UNDERWRITERS OF LLOYD'S, LONDON THROUGH COVERHOLDER BRECKENRIDGE INSURANCE SERVICES LLC AND OVERBY-SEAWELL COMPANY." The certificate of insurance was prepared on March 2, 2016 and stated that the coverage period was from February 29, 2016 to February 28, 2017 or until cancelled, that the coverage limit was $71,000, and that the total premium was $1,218.36.

85. A letter on Centennial letterhead dated November 21, 2017, represented to Plaintiff that the flood insurance coverage on the Property was insufficient, stating: "Our records indicate the coverage amount should be at least $190,200.00. With your current coverage of $125,000.00, an additional $65,200.00 of flood coverage is needed to prevent a shortage. If you do not provide adequate proof of flood insurance coverage within 45 days of this letter, we will purchase the necessary flood insurance coverage for you. . . . The premium we pay will be charged to your account at the end of 45 days."

86.     Thereafter, a certificate of insurance was issued on January 8, 2018 for the coverage period of January 8, 2018 to January 8, 2019 providing flood insurance coverage through Great American in the amount of $65,200 with a total premium of $1,017.12.

87.     On numerous occasions, Plaintiff notified Centennial of its errors relating to the force-placed insurance on the Property, satisfying the error resolution procedures of the Real Estate Settlement Procedure Act ("RESPA") and Regulation X, as it asserted an error that included the name of the borrower, information that enabled the servicer to identify the borrower's mortgage loan account, and the error the borrower believed had occurred.  12 C.F.R §1024.35.

88.     Regulation X, 12 C.F.R §1024.35(e), requires that upon receipt of a Notice of Error, the servicer:

> must respond to a notice of error by either: (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

89.     In response to Plaintiff's notices, Centennial fully refunded Plaintiff's charges on four occasions, partially refunded Plaintiff's charges on three occasions,

and refused to refund Plaintiff's charges entirely on four occasions. Plaintiff's notification of force-placed insurance-type charges and Centennial's refunds are depicted in the following chart:

| Date | Force-placed insurance type | Force-placed premium | Refund (if any) |
|---|---|---|---|
| 12/9/11 | Flood | $5,606.74 | -0.00- |
| 11/22/12 | F/P FLHAZ | $1,881.36 | $1,881.36 |
| 1/4/13 | FLW | $3,448.02 | $141.71 |
| 1/8/13 | Flood | $5,688.21 | $1,558.57 |
| 2/23/14 | Flood | $5,688.21 | $5,688.21 |
| 3/1/15 | Flood | $1,235.52 | $357.80 |
| 11/16/15 | Flood | $3,394.24 | $3,394.24 |
| 2/29/16 | Flood | $1,218.36 | -0.00- |
| 4/15/17 | Flood | $1,048.32 | $427.93 |
| 1/8/18 | Flood | $1,017.12 | -0.00- |
| | Totals: | $30,226.10 | $13,449.82 |
| | Net overcharges: | | $16,776.28 |

90. Plaintiff has been harmed as a result of Defendants' manipulative, unlawful, and unjust force-placed insurance practices, including, but not limited to, the un-refunded cost of the force-placed insurance as well as the payment of grossly excessive premiums bearing no relation to the cost of insurance.

40

91.     The actions and practices described above are unjust and undertaken in violation of the mortgage agreements and in bad faith with the sole objective to maximize profits.  Borrowers who, for whatever reason, have stopped paying for insurance or are allegedly under-insured on mortgaged property are charged hyper-inflated and illegitimate noncompetitive "premiums" for force-placed insurance. These premiums are inflated to include undisclosed kickbacks to the Defendants or their affiliates (who, as described herein, perform little to no functions related to the force-placement of the individual policies), as well as the cost of administrative services.

92.     There are no material differences between Defendants' actions and practices directed to Plaintiff, and their actions and practices directed to the Class.

## CLASS ALLEGATIONS

93.     Plaintiff brings this action on his own behalf, and on behalf of nationwide class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3):

**Nationwide Class:**

> All borrowers who, during the applicable statute of limitations, were charged by Centennial or its affiliates for a force-placed hazard and/or flood insurance policy placed on property located in the United States that exceeded the insurable value of the structure.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees (the "Nationwide Class").

94.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence that would be used to prove those elements in individual actions alleging the same claims.

95.     Numerosity:  The Class is so numerous that joinder of all members is impracticable.  Plaintiff believes that thousands of persons entered into mortgage loans with Centennial that included the obligation to maintain hazard and/or flood insurance.

96.     Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class.  These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

        a.     whether Defendants engaged in a pattern of overcharging their mortgage customers for force-placed insurance;

        b.     whether Centennial breached the mortgage loan agreements with Plaintiff and Class members by charging for force-placed insurance that included illegal kickbacks (including unwarranted commissions and reinsurance payments) and by charging Plaintiff and Class members for servicing their loans;

c.     whether Centennial breached the implied covenant of good faith and fair dealing with Plaintiff and Class members by entering into exclusive arrangements with selected insurers that resulted in unnecessary and/or inflated insurance premiums being charged to Plaintiff and Class members;

d.     whether one or more Defendants have been unjustly enriched at the expense of Plaintiff and Class members;

e.     whether one or more Defendants manipulated force-placed mortgage purchases in order to maximize their profits to the detriment of Plaintiff and Class members;

f.     whether the premiums charged are inflated to include kickbacks and unwarranted "commissions";

g.     whether the premiums charged are inflated to include charges for bundled administrative services that OSC provided to Centennial, and which are not chargeable to Plaintiff and Class members under the terms of their mortgages; and

h.     whether Plaintiff and Class members are entitled to damages or restitution as a result of one or more Defendant's conduct.

97.     Typicality:  All of Plaintiff's claims are typical of the claims of the Class since Plaintiff entered into a mortgage loan contract with Centennial for a property located in Florida, which obligated Plaintiff to maintain minimum amounts

of hazard and/or flood insurance, as did each member of the Class. Furthermore, Plaintiff and all members of the Class suffered monetary and economic injuries arising out of Defendants' wrongful conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent Class members.

98. <u>Adequacy</u>: Plaintiff is an adequate representative because his interests do not conflict with the interests of the Class that he seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and he intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

99. <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injuries suffered by each individual Class member are relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation resulting from Defendants' conduct. It would be virtually impossible for members of the Class to individually and effectively redress Defendants' misconduct. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device

presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

100.  Defendants acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

**COUNT I**
**BREACH OF CONTRACT**
**(Against Centennial)**

101.  Plaintiff re-alleges paragraphs 1-8, 14-15, 40-51, 52a, 53-67, and 69-92 above as if fully set forth herein.

102.  Plaintiff and all Class members have or had mortgages that are or were owned and/or serviced by Centennial.

103.  Plaintiff and these Class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding requirements for force-placed insurance and its placement by Centennial.

104.  Plaintiff's and Class members' mortgages require that they maintain insurance on their properties and if Centennial determines that they fail to do so, Centennial may obtain insurance coverage to protect its interest in the property, "force-place" the coverage, and charge the borrower the cost.

105. Centennial charges borrowers premiums that include unearned "commissions" or kickbacks, as well as bundled administrative and other

impermissible costs. These costs are not costs of coverage, and are not applied to protecting Centennial's rights or risk in the collateral for borrowers' mortgage loans. Centennial breached the mortgage agreements by, among other things, charging Plaintiff and Class members amounts beyond the actual cost of coverage.

106. Plaintiff and Class members suffered damages as a result of Centennial's breaches of contract.

### COUNT II
### BREACH OF IMPLIED COVENANT OF GOOD FAITH
### AND FAIR DEALING
### (Against Centennial)

107. Plaintiff re-alleges paragraphs 1-8, 14-15, 40-51, 52a, 53-67, and 69-92 above as if fully set forth herein.

108. A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

109. Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

110. Plaintiff and the Class members' mortgage agreements allow Centennial to force-place insurance coverage on the borrower in the event

Centennial determines that the borrower has insufficient coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

111.   Centennial is afforded substantial discretion in force-placing insurance coverage.  It is permitted to select the company from which it purchases force-placed insurance and negotiate a price for the coverage it procures, but has an obligation to exercise the discretion afforded in good faith and not capriciously or in bad faith.

112.   Centennial also is afforded substantial discretion in determining whether the amount of insurance maintained on the properties in the Centennial mortgage loan portfolio is sufficient.  The mortgage documents do not state how Centennial determines the adequacy of the insurance.  Nevertheless, Centennial has an obligation to exercise the discretion afforded in good faith and not capriciously or in bad faith.

113.   Plaintiff does not seek to vary the express terms of the mortgage contract, but to insure that Centennial exercises its discretion in good faith.  Centennial breached the implied covenant of good faith and fair dealing by, among other things:

a.     manipulating the force-placed insurance market by selecting an insurer and broker that artificially inflated premiums to include kickbacks to Centennial, and by failing to seek competitive bids on the open market and, instead, contracting to create "back room" deals whereby insurance coverage

is routinely purchased by OSC on Centennial's behalf from Underwriters (and later Great American) without seeking a competitive price;

b.    improperly and/or unfairly exercising its discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by selecting force-placed insurance policies with artificially inflated premiums and undisclosed kickbacks to maximize its own profits;

c.    assessing inflated and unnecessary insurance policy premiums against Plaintiff and the Class and misrepresenting the reason for the cost of the policies;

d.    collecting or receiving a percentage of the premiums charged to Plaintiff and the Class as a kickback and not passing that percentage on to Plaintiff and the Class as the borrowers, thereby creating the incentive to seek the highest-priced premiums possible;

e.    charging Plaintiff and the Class for commissions when the insurance is prearranged and no commission is due;

f.    charging Plaintiff and the Class the cost of having OSC perform its obligation of administering its mortgage portfolio, which is not properly chargeable to Plaintiff or the Class;

g.    improperly and/or unfairly exercising its discretion to determining the amount of insurance required; and

h.      force-placing insurance coverage in excess of what is required

by law or borrowers' mortgage agreements.

114.   Plaintiff and the Class suffered damages as a result of Centennial's

breaches of the implied covenant of good faith and fair dealing.

## COUNT III
## UNJUST ENRICHMENT
### (Against OSC and Underwriters)

115.   Plaintiff re-alleges paragraphs 1-8, 14, 16-36, 38, 40-51, 52b-d, 53-55,

61-69, and 77-92 above as if fully set forth herein.

116.   No contract exists between Plaintiff and OSC or between Plaintiff and

Underwriters.

117.   Plaintiff and Class members conferred direct benefits on Underwriters

in the form of inflated force-placed insurance premiums.

118.   Plaintiff and Class members conferred direct benefits on OSC in the

form of excessive commissions that were tied directly to the inflated cost of the

force-placed insurance premiums.

119.   Specifically, Plaintiff and the Class conferred direct benefits on OSC

and/or Underwriters in the following manner:

a.      Plaintiff and the Class conferred a direct benefit on OSC when

the inflated premium amount was either deducted from Plaintiff's and Class

members' escrow accounts or added to Plaintiff's and Class members'

49

mortgage balance and remitted by Centennial to OSC, which then remitted to Underwriters the inflated premium amount less OSC's commissions based on the artificially inflated and grossly excessive net written premiums paid by Plaintiff and the Class; and

b. Plaintiff and the Class conferred a direct benefit on Underwriters when Plaintiff and the Class paid artificially inflated and grossly excessive premiums that did not reflect the true cost of the insurance.

120. Further, OSC and/or Underwriters received financial benefits in the form of increased interest income and/or "soft-dollar" credits.

121. These payments directly benefitted OSC and/or Underwriters and were made to the detriment of the borrowers. The kickbacks, commissions, and subsidized costs were subsumed into the price of the insurance premiums and ultimately paid by the borrowers. Therefore, OSC and/or Underwriters had the incentive to charge and collect unreasonably inflated premiums for the force-placed policies placed on Plaintiff's and the Class' properties.

122. In the same manner as described above, Plaintiff and the Class continued to confer direct benefits on OSC when master policy for the force-placed insurance later was obtained from Great American. Great American issued the force-placed insurance on the Property for the period July 2016 to July 2018.

123.   Therefore, Plaintiff and the Class conferred an unjust benefit on OSC and/or Underwriters.

124.   OSC and/or Underwriters had knowledge of this unjust benefit and voluntarily accepted and retained the benefit conferred on them.

125.   It would be inequitable for OSC and/or Underwriters to retain the benefit without first paying the value thereof to Plaintiff and the Class.  OSC and/or Underwriters will be unjustly enriched if they are allowed to retain the aforementioned benefits, and Plaintiff and each Class member is entitled to recover the amount by which OSC and/or Underwriters were unjustly enriched at his or her expense.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and all similarly situated individuals, demands judgment against Defendants as follows:

A.   Declaring this action to be a proper class action maintainable pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) and declaring Plaintiff and his counsel to be representatives of the Nationwide Class;

B.   Awarding damages sustained by Plaintiff and the Class as a result of Centennial's breaches of the subject mortgage contracts and/or the implied covenant of good faith and fair dealing, together with pre-judgment interest;

C. Finding that OSC and/or Underwriters have been unjustly enriched and requiring OSC and/or Underwriters to disgorge and refund the amount of all unjust benefits to Plaintiff and the Class, together with pre-judgment interest;

D. Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Class Counsel and experts, and reimbursement of expenses; and

E. Awarding such other and further relief the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

    *s/ Robert C. Gilbert*
Robert C. Gilbert
Florida Bar No. 561861
**KOPLOWITZ OSTROW FERGUSON
WEISELBERG GILBERT**
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Telephone: 305-384-7270
Email: gilbert@kolawyers.com

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
Joseph P. Guglielmo (*pro hac vice*)
Thomas K. Boardman (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-4478
Facsimile: 212-223-6334
Email: jguglielmo@scott-scott.com
      tboardman@scott-scott.com

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
Erin Green Comite (*pro hac vice*)
Margaret B. Ferron (*pro hac vice*)
156 South Main Street
Colchester, CT  06415
Telephone:  860-537-5537
Facsimile:  860-537-4432
Email:  ecomite@scott-scott.com
            mferron@scott-scott.com

**DAVIS & TALIAFERRO, LLC**
Greg L. Davis (*pro hac vice forthcoming*)
7031 Halcyon Park Drive
Montgomery, AL 36117
Telephone:  334-832-9080
Facsimile:  334-409-7001
Email:  gldavis@knology.net

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

 *s/ Robert C. Gilbert*  
Robert C. Gilbert  
Florida Bar No. 561861  
**KOPLOWITZ OSTROW FERGUSON WEISELBERG GILBERT**  
2800 Ponce de Leon Boulevard  
Suite 1100  
Coral Gables, FL 33134  
Telephone:  305-384-7270  
Email:  gilbert@kolawyers.com

# EXHIBIT 2

Centennial Bank v. Great American Insurance Company
and Great American E&S Insurance

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Florida

SIMEON PENTON, on behalf of himself
and all others similarly situated )
*Plaintiff* )
v. ) Civil Action No. 4:18-cv-00450-MW-CAS
CENTENNIAL BANK, GREAT AMERICAN INSURANCE )
COMPANY, and OVERBY-SEAWELL COMPANY )
*Defendant* )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Great American Insurance Company
c/o Florida Chief Financial Officer as Registered Agent, 200 E. Gaines Street, Tallahassee, Florida 32399

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See attached Schedule B.

| Place: Mike Mobley Reporting<br>312 Walnut Street #1600-A<br>Cincinnati, Ohio 45202 | Date and Time:<br>06/09/2021 12:00 pm |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 04/21/2021

CLERK OF COURT

OR

_____        _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Centennial Bank                                                      , who issues or requests this subpoena, are:

Keith L. Bell, Jr., Clark Partington, 215 S. Monroe Street, Suite 530, Tallahassee, FL 32301, 850-320-6838, kbell@clarkpartington.com

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   4:18-cv-00450-MW-CAS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❒  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____                          _____
                                                                *Server's signature*

                                                               _____
                                                                *Printed name and title*

                                                               _____
                                                                *Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## <u>SCHEDULE B - DOCUMENTS TO BE PRODUCED</u>
*Great American*

## <u>INSTRUCTION REGARDING PRODUCTION COSTS</u>

***IF THE FEE FOR PHOTOCOPYING EXCEEDS ONE HUNDRED ($100.00) DOLLARS, PLEASE CONTACT KEITH L. BELL JR., ESQUIRE AT (850) 320-6832 IN ADVANCE OF THE COPYING FOR AUTHORIZATION TO DO SO.  If it is necessary to have the fee paid in advance or if the records cannot be gathered by the appointed date, please contact Keith L. Bell, Jr., Esquire on or before the date on the subpoena and arrangements will be made.***

## <u>INSTRUCTION REGARDING OVERLAP WITH OTHER SUBPOENAS</u>

A materially similar version of the documentary portion of this subpoena is being delivered in the form of a subpoena for deposition duces tecum to Great American Insurance Company and non-testimonial subpoenas duces tecum to Great American Assurance Company ("Assurance") and Great American E&S Insurance Company ("E&S").  On the information now known to Centennial Bank, Policy Number E029008 was issued by Assurance, Policy Numbers E029009 and E029010 were issued by E&S, and Great American Insurance Company is the parent organization of the Great American Insurance Group.  Centennial Bank has no insight on the maintenance of records and the division of labor within the Great American Insurance Group and has issued the separate subpoenas in an abundance of caution.

The subpoenas are not intended to require a duplication of production or effort. Great American Insurance Company, Assurance, and E&S may make a

single, joint production encompassing the records available to the appropriate companies on the listed subjects.

## I.    <u>DEFINITIONS</u>

A.    As used herein, the term "***document***" includes without limitation, the following items, whether printed or written or produced by hand: contracts; agreements; communications; correspondence; telegrams; telex; memoranda; notes; summaries; notes, memorandum or records of telephone conversations; summaries or records of personal conversations or interviews; statements of witnesses; diaries; reports; receipts; notebooks; note charts; books; conferences; summaries, studies, or reports of investigations or negotiations; technical studies or reports; test results; drafts; letters; any marginal comments appearing on any document; voice recording tapes; microfilm or microfiche; photographs; data processing cards or disks; video recording tapes; calendars; graphs; charts; computer printouts, e-mails, text messages, computer-stored material and other computer generated documents; and includes all drafts of documents and copies of such documents containing marginal notes or variations of any of the foregoing, now in your custody or control and all other writings.

B.     As used herein, the term **"correspondence"** includes without limitation, the following items, whether printed or written or produced by hand: letters, electronic mail, text messages, memorandum, and notes.

C.     As used herein, the term **"copy"** when used in reference to a document means any color or black-and-white facsimile reproduction of a document, regardless of whether the facsimile reproduction is made by means of carbon paper, pressure sensitive paper, xerography or other means or process.

D.     As used herein, the term **"communication"** includes any document, writing, or oral conversation between at least two parties, including, but not limited to, telephone conversations and meetings, letters, facsimile, telegraphic, and telex communications.   A communication is "**between**" two parties when one of the parties, or an employee, official, or agent of one of the parties, is the sender (e.g., the "from" line on an email communication) and the other party, or an employee, official, or agent of the other party, is a recipient (e.g., a party on the "to" or "cc" or "bcc" line of an email communication), irrespective of how many other recipients exist.

E.     As used herein, the terms **"and"** and **"or"** shall be construed conjunctively rather than disjunctively, as is necessary to make each request inclusive rather than exclusive.

F.     As used herein, the phrase ***"reflecting or relating"*** means being connected or associated, or referring to something.

G.     As used herein, the term "***You***" (or the possessive form "***Your***") or "***Great American***" refers to Great American Insurance Company, Great American Assurance Company and/or Great American E&S Insurance Company, including any attorneys, agents or representatives acting or purporting to act on behalf of any of the preceding.

H.     As used herein, the phrase "***Plaintiffs***" refers to Plaintiff, SIMEON PENTON, on behalf of himself, the purported class members and all other similarly situated, including any attorneys, agents or representatives acting or purporting to act on their behalf.

I.     As used herein, the phrase "***Centennial***" refers to Defendant, CENTENNIAL BANK, its holding company Home Bancshares, Inc., and the officers, agents, affiliates, and employees of both entities.

J.     As used herein, the phrase "***Force Placed Insurance***" or "***FPI***" refers to insurance coverage placed by or on behalf of a lending institution or mortgage servicer when a policy of insurance covering mortgage property has been cancelled, has lapsed, or is determined to be insufficient.  The term should be considered synonymous with the term "Creditor Placed Insurance" applicable to property for

which the named insured's insurable interest arises as a mortgagee or servicing agent for the mortgagee interest of another.

K.     As used herein, the terms **_"identity," "identify"_** or **_"identification"_** means:

(1)     When used in reference to an individual: the individual's full name, home address, business occupation, business address, business title or occupation, and present and past relationship to any party;

(2)     When used in reference to a document: the title of the document, along with its subject matter, author, date or the date prepared, location and custodian;

(3)     When used in reference to an act: the time and place of the act, the nature of the act, the name of the person or persons performing or participating in the act, and the name of each person witnessing or having knowledge of the act;

(4)     When used in reference to an event: the time and place of the event, the nature of the event, the name of the person or persons participating in the event, and the name of each person witnessing or having knowledge of the event.

(5)     When used in reference to a corporate entity or entities: the full

corporate name and the date and place of incorporation, if

known, and its present address and telephone number.

## II.    **INSTRUCTIONS FOR FORMAT OF PRODUCTION**

A. Format of Electronically Stored Information

Electronically Stored Information ("ESI") should be produced in a processed, near-native format. The records should be provided with multi-page searchable text (.TXT) files. Text should be created using text extraction whenever possible. If text extraction is not possible or a document has been redacted, text created from optical character recognition (OCR) is acceptable. The text files should have the same name as the near-native file with the exception of the file extension.

All files produced should include a DAT load file for use with Everlaw. The DAT load file should also include a file path field for each record corresponding to the file structure in the production data set. The DAT load file should indicate document breaks. Fields should be provided in the DAT load file for each of the file type paths such as "Native Path" for native files and "Text Path" for text files. All file path fields should correspond to the file structure in the production data set.

In the alternative of producing only native and text files, the producing party may produce Portable Digital Format (.PDF) image files as long as the corresponding near-native file and text of the image file are also produced. The

producing party should not produce image files without the corresponding near-native and text files for each document. As referenced above, fields should be provided in the DAT load file for each of the file type paths such as "Image Path" for PDF files, "Native Path" for native files and "Text Path" for text files. All file path fields should correspond to the file structure in the production data set.

To the extent available, the following metadata values and fields should be extracted and produced in the DAT load file:

- Production ID (if producing native and text files only)
- Bates Begin (if producing image files with bates numbers in addition to native and text files; if this process is used, the native and text files should be named with the beginning Bates number of the image)
- Bates End (if producing image files with bates numbers in addition to native and text files; if this process is used, the native and text files should be named with the beginning Bates number of the image)
- Bates Family Range
- Parent ID
- Attachment ID
- Custodian
- To
- From
- CC
- BCC
- Subject
- Date Sent
- Time Sent
- Date Created
- Time Created
- Date Last Modified
- Time Last Modified
- File Name (parents, attachments and/or loose files)
- File Extension

- Record Type
- Confidentiality
- MD5 or SHA1 Hash Value
- All Custodians (identifying all custodians with a hash value duplicate file)

The parties may deduplicate ESI utilizing the MD5 or SHA1 hash value, on a global (horizontal) scale provided a field listing all custodians that contained the same document in their data set is provided in the DAT load file. If a field containing all custodian names that contained the duplicate document cannot be provided, deduplication should be based on a custodian (vertical) level.

Production of responsive data contained in relational databases other than Microsoft Access should be achieved via a report or export of such data to Microsoft Excel spreadsheets that will be produced.

To the extent responsive, native files containing information subject to a claim of privilege, shall be produced in the form of a redacted image file. For audio files with privileged data, breaks may be made in the files provided the method of production is further agreed to by all parties. If audio files are maintained in a non-standard format, the files should be produced in MP3 format.

Document confidentiality designations should be provided in a field within the DAT load file. If the native documents are produced with image files, the confidentiality designation may also be branded on the image files.

B. Format of Paper Documents

All paper documents should be scanned and produced in multi-page, Portable Digital Format (.PDF) files on a per document basis, however, document families may be scanned together. Documents shall be produced in the same sequence as contained or found in the original file folder and the production shall include a copy of the file folder itself.

Document confidentiality designations should be branded on each page and, if reasonably possible, provide the confidentiality designation in a field within the DAT load file.

To the extent possible, the following fields and values should be produced in the DAT load file:

- Bates Begin
- Bates End
- Confidentiality
- Custodian
- Page Count

## III. **DOCUMENTS/THINGS TO BE PRODUCED**:

A. General documents

1. All documents containing non-duplicative actuarial information (i.e., only one document containing a given set of actuarial information need be produced, notwithstanding the "all documents" requirement), regarding the pricing of risk

premiums or modeling of portfolio risk for FPI policies written by you, <u>that was publicly disclosed</u> at any time from January 1, 2016 through the present date.

2.    All documents constituting communications between You and Southern Pioneer Property and Casualty Insurance Company regarding negotiations of premiums of FPI policy for which Centennial would be a named insured, including but not limited to the policy numbers disclosed herein. For the avoidance of doubt, this request concerns the negotiation and setting of policy terms and shall be construed to exclude the calculation of the premium for any specific insured property.

3.    All documents constituting communications between You and Centennial regarding negotiations of premiums of FPI policy for which Centennial would be a named insured, including but not limited to the policy numbers disclosed herein. For the avoidance of doubt, this request concerns the negotiation and setting of policy terms and shall be construed to exclude the calculation of the premium for any specific insured property.

4.    To the extent not included in the above, any documents that identify any contractual relationship between Centennial and Southern Pioneer Property and Casualty Insurance Company, <u>other than</u> the relationship in which Southern Pioneer Property and Casualty Insurance Company serves as the insurance broker for Centennial.

5.      Any non-duplicative written remarks concerning FPI pricing and commission structures delivered by You (including agents and lobbyists operating on Your behalf) to any insurance regulator or legislative, or other local governmental body operating in the United States, such remarks being delivered at any time between January 1, 2016 and the present date.

B. Policy Number E029008

6.      One form exemplar policy for each different FPI product family, available from You at any time from January 1, 2016 to the present date, providing coverage of the same type as that provided by Policy Number E029008.  If You contend that Policy Number E029008 is materially similar to the form exemplar policy and You provide a statement to that effect, no documents need be provided in response to this request.

7.      The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2016.

8.      The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy

period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2016.

9. The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2017.

10. The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2017.

11. The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **one of the five lowest**

"Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2018.

12.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2018.

13.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2019.

14.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2019.

15.    All documents containing non-duplicative pricing information (i.e., only one document containing a given set of pricing information need be produced, notwithstanding the "all documents" requirement) of any market competitor, for any product family directly competitive to Policy Number E029008, during the period from January 1, 2016 through the present date.

C. Policy Number E029009

16.    One form exemplar policy for each different FPI product family, available from You at any time from January 1, 2016 to the present date, providing coverage of the same type as that provided by Policy Number E029009.  If You contend that Policy Number E029009 is materially similar to the form exemplar policy and You provide a statement to that effect, no documents need be provided in response to this request.

17.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2016.

18.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy

period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2016.

19.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2017.

20.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2017.

21.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **one of the five lowest**

"Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2018.

22.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2018.

23.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2019.

24.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2019.

25.   All documents containing non-duplicative pricing information (i.e., only one document containing a given set of pricing information need be produced, notwithstanding the "all documents" requirement) of any market competitor, for any product family directly competitive to Policy Number E029009, during the period from January 1, 2016 through the present date.

D. Policy Number E029010

26.   One form exemplar policy for each different FPI product family, available from You at any time from January 1, 2016 to the present date, providing coverage of the same type as that provided by Policy Number E029010.  If You contend that Policy Number E029010 is materially similar to the form exemplar policy and You provide a statement to that effect, no documents need be provided in response to this request.

27.   The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **one of the five lowest** pricing rates for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2016.

28.   The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy

period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **the median** pricing rate for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2016.

29.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **one of the five lowest** pricing rates for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2017.

30.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **the median** pricing rate for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2017.

31.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **one of the five lowest** pricing

rates for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2018.

32. The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **the median** pricing rate for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2018.

33. The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **one of the five lowest** pricing rates for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2019.

34. The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **the median** pricing rate for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2019.

19

35.    All documents containing non-duplicative pricing information (i.e., only one document containing a given set of pricing information need be produced, notwithstanding the "all documents" requirement) of any market competitor, for any product family directly competitive to Policy Number E029010, during the period from January 1, 2016 through the present date.

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Florida

| | |
|---|---|
| SIMEON PENTON, on behalf of himself and all others similarly situated | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  4:18-cv-00450-MW-CAS |
| CENTENNIAL BANK, GREAT AMERICAN INSURANCE COMPANY, and OVERBY-SEAWELL COMPANY | ) |
| *Defendant* | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Great American E&S Insurance Company
301 E. Fourth Street, 25th Floor, Cincinnati, Ohio 45202

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

　　　See attached Schedule B.

| Place: Mike Mobley Reporting 312 Walnut Street #1600-A Cincinnati, Ohio 45202 | Date and Time: 06/09/2021 12:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

　　　The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:　04/21/2021

| | |
|---|---|
| *CLERK OF COURT* | OR |
| Signature of Clerk or Deputy Clerk | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
Centennial Bank　　　　　　　　　　　　, who issues or requests this subpoena, are:

Keith L. Bell, Jr., Clark Partington, 215 S. Monroe Street, Suite 530, Tallahassee, FL 32301, 850-320-6838, kbell@clarkpartington.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:18-cv-00450-MW-CAS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE B - DOCUMENTS TO BE PRODUCED
*Great American*

## INSTRUCTION REGARDING PRODUCTION COSTS

**IF THE FEE FOR PHOTOCOPYING EXCEEDS ONE HUNDRED ($100.00) DOLLARS, PLEASE CONTACT KEITH L. BELL JR., ESQUIRE AT (850) 320-6832 IN ADVANCE OF THE COPYING FOR AUTHORIZATION TO DO SO. If it is necessary to have the fee paid in advance or if the records cannot be gathered by the appointed date, please contact Keith L. Bell, Jr., Esquire on or before the date on the subpoena and arrangements will be made.**

## INSTRUCTION REGARDING OVERLAP WITH OTHER SUBPOENAS

A materially similar version of the documentary portion of this subpoena is being delivered in the form of a subpoena for deposition duces tecum to Great American Insurance Company and non-testimonial subpoenas duces tecum to Great American Assurance Company ("Assurance") and Great American E&S Insurance Company ("E&S"). On the information now known to Centennial Bank, Policy Number E029008 was issued by Assurance, Policy Numbers E029009 and E029010 were issued by E&S, and Great American Insurance Company is the parent organization of the Great American Insurance Group. Centennial Bank has no insight on the maintenance of records and the division of labor within the Great American Insurance Group and has issued the separate subpoenas in an abundance of caution.

The subpoenas are not intended to require a duplication of production or effort. Great American Insurance Company, Assurance, and E&S may make a

1

single, joint production encompassing the records available to the appropriate companies on the listed subjects.

## I.    **DEFINITIONS**

A.    As used herein, the term "***document***" includes without limitation, the following items, whether printed or written or produced by hand: contracts; agreements; communications; correspondence; telegrams; telex; memoranda; notes; summaries; notes, memorandum or records of telephone conversations; summaries or records of personal conversations or interviews; statements of witnesses; diaries; reports; receipts; notebooks; note charts; books; conferences; summaries, studies, or reports of investigations or negotiations; technical studies or reports; test results; drafts; letters; any marginal comments appearing on any document; voice recording tapes; microfilm or microfiche; photographs; data processing cards or disks; video recording tapes; calendars; graphs; charts; computer printouts, e-mails, text messages, computer-stored material and other computer generated documents; and includes all drafts of documents and copies of such documents containing marginal notes or variations of any of the foregoing, now in your custody or control and all other writings.

B.     As used herein, the term ***"correspondence"*** includes without limitation, the following items, whether printed or written or produced by hand: letters, electronic mail, text messages, memorandum, and notes.

C.     As used herein, the term ***"copy"*** when used in reference to a document means any color or black-and-white facsimile reproduction of a document, regardless of whether the facsimile reproduction is made by means of carbon paper, pressure sensitive paper, xerography or other means or process.

D.     As used herein, the term ***"communication"*** includes any document, writing, or oral conversation between at least two parties, including, but not limited to, telephone conversations and meetings, letters, facsimile, telegraphic, and telex communications.   A communication is "***between***" two parties when one of the parties, or an employee, official, or agent of one of the parties, is the sender (e.g., the "from" line on an email communication) and the other party, or an employee, official, or agent of the other party, is a recipient (e.g., a party on the "to" or "cc" or "bcc" line of an email communication), irrespective of how many other recipients exist.

E.     As used herein, the terms ***"and"*** and ***"or"*** shall be construed conjunctively rather than disjunctively, as is necessary to make each request inclusive rather than exclusive.

F.      As used herein, the phrase *"reflecting or relating"* means being connected or associated, or referring to something.

G.      As used herein, the term "*You*" (or the possessive form "*Your*") or "*Great American*" refers to Great American Insurance Company, Great American Assurance Company and/or Great American E&S Insurance Company, including any attorneys, agents or representatives acting or purporting to act on behalf of any of the preceding.

H.      As used herein, the phrase "*Plaintiffs*" refers to Plaintiff, SIMEON PENTON, on behalf of himself, the purported class members and all other similarly situated, including any attorneys, agents or representatives acting or purporting to act on their behalf.

I.      As used herein, the phrase "*Centennial*" refers to Defendant, CENTENNIAL BANK, its holding company Home Bancshares, Inc., and the officers, agents, affiliates, and employees of both entities.

J.      As used herein, the phrase "*Force Placed Insurance*" or "*FPI*" refers to insurance coverage placed by or on behalf of a lending institution or mortgage servicer when a policy of insurance covering mortgage property has been cancelled, has lapsed, or is determined to be insufficient.  The term should be considered synonymous with the term "Creditor Placed Insurance" applicable to property for

which the named insured's insurable interest arises as a mortgagee or servicing agent for the mortgagee interest of another.

K.     As used herein, the terms *"identity," "identify"* or *"identification"* means:

(1)     When used in reference to an individual: the individual's full name, home address, business occupation, business address, business title or occupation, and present and past relationship to any party;

(2)     When used in reference to a document: the title of the document, along with its subject matter, author, date or the date prepared, location and custodian;

(3)     When used in reference to an act: the time and place of the act, the nature of the act, the name of the person or persons performing or participating in the act, and the name of each person witnessing or having knowledge of the act;

(4)     When used in reference to an event: the time and place of the event, the nature of the event, the name of the person or persons participating in the event, and the name of each person witnessing or having knowledge of the event.

5

(5) When used in reference to a corporate entity or entities: the full corporate name and the date and place of incorporation, if known, and its present address and telephone number.

## II.    INSTRUCTIONS FOR FORMAT OF PRODUCTION

A. Format of Electronically Stored Information

Electronically Stored Information ("ESI") should be produced in a processed, near-native format. The records should be provided with multi-page searchable text (.TXT) files. Text should be created using text extraction whenever possible. If text extraction is not possible or a document has been redacted, text created from optical character recognition (OCR) is acceptable. The text files should have the same name as the near-native file with the exception of the file extension.

All files produced should include a DAT load file for use with Everlaw. The DAT load file should also include a file path field for each record corresponding to the file structure in the production data set. The DAT load file should indicate document breaks. Fields should be provided in the DAT load file for each of the file type paths such as "Native Path" for native files and "Text Path" for text files. All file path fields should correspond to the file structure in the production data set.

In the alternative of producing only native and text files, the producing party may produce Portable Digital Format (.PDF) image files as long as the corresponding near-native file and text of the image file are also produced. The

producing party should not produce image files without the corresponding near-native and text files for each document. As referenced above, fields should be provided in the DAT load file for each of the file type paths such as "Image Path" for PDF files, "Native Path" for native files and "Text Path" for text files. All file path fields should correspond to the file structure in the production data set.

To the extent available, the following metadata values and fields should be extracted and produced in the DAT load file:

- Production ID (if producing native and text files only)
- Bates Begin (if producing image files with bates numbers in addition to native and text files; if this process is used, the native and text files should be named with the beginning Bates number of the image)
- Bates End  (if producing image files with bates numbers in addition to native and text files; if this process is used, the native and text files should be named with the beginning Bates number of the image)
- Bates Family Range
- Parent ID
- Attachment ID
- Custodian
- To
- From
- CC
- BCC
- Subject
- Date Sent
- Time Sent
- Date Created
- Time Created
- Date Last Modified
- Time Last Modified
- File Name (parents, attachments and/or loose files)
- File Extension

- Record Type
- Confidentiality
- MD5 or SHA1 Hash Value
- All Custodians (identifying all custodians with a hash value duplicate file)

The parties may deduplicate ESI utilizing the MD5 or SHA1 hash value, on a global (horizontal) scale provided a field listing all custodians that contained the same document in their data set is provided in the DAT load file. If a field containing all custodian names that contained the duplicate document cannot be provided, deduplication should be based on a custodian (vertical) level.

Production of responsive data contained in relational databases other than Microsoft Access should be achieved via a report or export of such data to Microsoft Excel spreadsheets that will be produced.

To the extent responsive, native files containing information subject to a claim of privilege, shall be produced in the form of a redacted image file. For audio files with privileged data, breaks may be made in the files provided the method of production is further agreed to by all parties. If audio files are maintained in a non-standard format, the files should be produced in MP3 format.

Document confidentiality designations should be provided in a field within the DAT load file. If the native documents are produced with image files, the confidentiality designation may also be branded on the image files.

B. Format of Paper Documents

All paper documents should be scanned and produced in multi-page, Portable Digital Format (.PDF) files on a per document basis, however, document families may be scanned together. Documents shall be produced in the same sequence as contained or found in the original file folder and the production shall include a copy of the file folder itself.

Document confidentiality designations should be branded on each page and, if reasonably possible, provide the confidentiality designation in a field within the DAT load file.

To the extent possible, the following fields and values should be produced in the DAT load file:

- Bates Begin
- Bates End
- Confidentiality
- Custodian
- Page Count

III. **DOCUMENTS/THINGS TO BE PRODUCED:**

A. General documents

1. All documents containing non-duplicative actuarial information (i.e., only one document containing a given set of actuarial information need be produced, notwithstanding the "all documents" requirement), regarding the pricing of risk

premiums or modeling of portfolio risk for FPI policies written by you, that was publicly disclosed at any time from January 1, 2016 through the present date.

2.      All documents constituting communications between You and Southern Pioneer Property and Casualty Insurance Company regarding negotiations of premiums of FPI policy for which Centennial would be a named insured, including but not limited to the policy numbers disclosed herein. For the avoidance of doubt, this request concerns the negotiation and setting of policy terms and shall be construed to exclude the calculation of the premium for any specific insured property.

3.      All documents constituting communications between You and Centennial regarding negotiations of premiums of FPI policy for which Centennial would be a named insured, including but not limited to the policy numbers disclosed herein. For the avoidance of doubt, this request concerns the negotiation and setting of policy terms and shall be construed to exclude the calculation of the premium for any specific insured property.

4.      To the extent not included in the above, any documents that identify any contractual relationship between Centennial and Southern Pioneer Property and Casualty Insurance Company, other than the relationship in which Southern Pioneer Property and Casualty Insurance Company serves as the insurance broker for Centennial.

5.      Any non-duplicative written remarks concerning FPI pricing and commission structures delivered by You (including agents and lobbyists operating on Your behalf) to any insurance regulator or legislative, or other local governmental body operating in the United States, such remarks being delivered at any time between January 1, 2016 and the present date.

B.  Policy Number E029008

6.      One form exemplar policy for each different FPI product family, available from You at any time from January 1, 2016 to the present date, providing coverage of the same type as that provided by Policy Number E029008.  If You contend that Policy Number E029008 is materially similar to the form exemplar policy and You provide a statement to that effect, no documents need be provided in response to this request.

7.      The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2016.

8.      The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy

period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2016.

9.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2017.

10.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2017.

11.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **one of the five lowest**

12

"Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2018.

12.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2018.

13.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2019.

14.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2019.

15.    All documents containing non-duplicative pricing information (i.e., only one document containing a given set of pricing information need be produced, notwithstanding the "all documents" requirement) of any market competitor, for any product family directly competitive to Policy Number E029008, during the period from January 1, 2016 through the present date.

C. Policy Number E029009

16.    One form exemplar policy for each different FPI product family, available from You at any time from January 1, 2016 to the present date, providing coverage of the same type as that provided by Policy Number E029009.  If You contend that Policy Number E029009 is materially similar to the form exemplar policy and You provide a statement to that effect, no documents need be provided in response to this request.

17.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2016.

18.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy

period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2016.

19.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2017.

20.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2017.

21.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **one of the five lowest**

15

"Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2018.

22.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2018.

23.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2019.

24.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2019.

25.     All documents containing non-duplicative pricing information (i.e., only one document containing a given set of pricing information need be produced, notwithstanding the "all documents" requirement) of any market competitor, for any product family directly competitive to Policy Number E029009, during the period from January 1, 2016 through the present date.

D. Policy Number E029010

26.     One form exemplar policy for each different FPI product family, available from You at any time from January 1, 2016 to the present date, providing coverage of the same type as that provided by Policy Number E029010. If You contend that Policy Number E029010 is materially similar to the form exemplar policy and You provide a statement to that effect, no documents need be provided in response to this request.

27.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **one of the five lowest** pricing rates for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2016.

28.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy

period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **the median** pricing rate for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2016.

29.　　The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **one of the five lowest** pricing rates for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2017.

30.　　The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **the median** pricing rate for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2017.

31.　　The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **one of the five lowest** pricing

rates for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2018.

32.　　The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **the median** pricing rate for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2018.

33.　　The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **one of the five lowest** pricing rates for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2019.

34.　　The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **the median** pricing rate for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2019.

35.     All documents containing non-duplicative pricing information (i.e., only one document containing a given set of pricing information need be produced, notwithstanding the "all documents" requirement) of any market competitor, for any product family directly competitive to Policy Number E029010, during the period from January 1, 2016 through the present date.

# EXHIBIT 3

Centennial Bank v. Great American Insurance Company
and Great American E&S Insurance

## RETURN OF SERVICE

UNITED STATES DISTRICT COURT
NORTHERN District of Florida

Case Number: 4:18-CV-00450-MW-CAS

Plaintiffs:
**SIMEON PENTON, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED**

vs.

Defendant:
**CENTENNIAL BANK, GREAT AMERICAN INSURANCE COMPANY, AND OVERBY-SEAWELL COMPANY**

For:
KEITH BELL, JR.
CLARK PARTINGTON
106 EAST COLLEGE PARK AVENUE
STE. 600
TALLAHASSEE, FL 32301

Received by NOLAN PROCESS SERVERS, LLC on the 26th day of April, 2021 at 4:29 pm to be served on **GREAT AMERICAN INSURANCE COMPANY C/O FLORIDA CHIEF FINANCIAL OFFICER, AS REG. AGENT, 200 EAST GAINES STREET, TALLAHASSEE, FL 32399**.

I, MICHAEL C. NOLAN, do hereby affirm that on the **27th day of April, 2021** at **8:20 am**, I:

**CORPORATE:** served by delivering a true copy of the **LETTER DATED: APRIL 21, 2021; SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION; SECOND CORRECTED NOTICE OF TAKING DEPOSITION DUCES TECUM; CFO CHECK NO. 30103 DATED: 4/26/2021 IN THE AMOUNT OF $15.00; WITNESS FEE CHECK NO. 30105 DATED; 4/26/2021 IN THE AMOUNT OF $40.56** with the date and hour of service endorsed thereon by me, to: **COLBY NUTTING** as **OPS CLERK** for the Registered Agent of GREAT AMERICAN INSURANCE COMPANY C/O FLORIDA CHIEF FINANCIAL OFFICER, AS REG. AGENT at the address of: **200 EAST GAINES STREET, TALLAHASSEE, FL 32399**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 30+, Sex: M, Race/Skin Color: WHITE, Height: 6'0", Weight: 200, Hair: BROWN, Glasses: N

I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served.  Under penalty of perjury I declare that the facts contained herein are true to the best of my knowledge.NO NOTARY REQUIRED PURSUANT TO F.S. 92.525 (2).

_____

**MICHAEL C. NOLAN**
Certified Process Server, #111

**NOLAN PROCESS SERVERS, LLC**
**7498 Anglewood Lane**
**Tallahassee, FL 32309**
**(850) 562-6058**

Our Job Serial Number: MCN-2021005423

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2b





*21-000201364*

CHIEF FINANCIAL OFFICER
JIMMY PATRONIS
STATE OF FLORIDA

---

SIMEON PENTON, ON BEHALF OF HIMSELF
AND ALL OTHERS SIMILARLY SITUATED

PLAINTIFF(S)

VS.

CENTENNIAL BANK, ET AL.

DEFENDANT(S)

_____/

**CASE #:** 4:18-CV-00450-MW-CAS
**COURT:** US DISTRICT COURT
**COUNTY:** NORTHERN
**DFS-SOP #:** 21-000201364

SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION; CORRECTED NOTICE OF TAKING DEPOSITION
DUCES TECUM OF GREAT AMERICAN INSURANCE COMPANY; SCHEDULE A; SUBPOENA TO PRODUCE
DOCUMENTS, INFORMATION OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION;
CHECK 30105 IN THE AMOUNT OF $40.56 PAYABLE TO GREAT AMERICAN INSURANCE COMPANY
***CHECK WILL BE SENT VIA PRIORITY MAIL***

# NOTICE OF SERVICE OF PROCESS

NOTICE IS HEREBY GIVEN of acceptance of Service of Process by the Chief Financial Officer of the
State of Florida. Said process was received in my office by PROCESS SERVER on Tuesday, April 27,
2021 and a copy was forwarded by ELECTRONIC DELIVERY on Friday, May 7, 2021 to the designated
agent for the named entity as shown below.

GREAT AMERICAN INSURANCE COMPANY
EVE CUTLER ROSEN
580 WALNUT STREET
CINCINNATI, OH 45202

**\*Our office will only serve the initial process(Summons and Complaint) or Subpoena and is not responsible
for transmittal of any subsequent filings, pleadings, or documents unless otherwise ordered by the Court
pursuant to Florida Rules of Civil Procedure, Rule #1.080**

Jimmy Patronis

Jimmy Patronis
Chief Financial Officer

KEITH L. BELL, JR., ESQ.
215 S. MONROE ST., STE 530
TALLAHASSEE, FL 32301

DR1

5/12/2021                                     ServeManager

# AFFIDAVIT OF SERVICE

| Case: | Court: | | County: | Job: |
|-------|--------|--|---------|------|
| 4:18-CV-00450-MW-CAS | UNITED STATES DISTRICT COURT NORTHERN District of Florida | | | 5658591 (2021006001) |

| Plaintiff / Petitioner: | Defendant / Respondent: |
|-------------------------|--------------------------|
| SIMEON PENTON, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED | CENTENNIAL BANK, GREAT AMERICAN INSURANCE COMPANY, AND OVERBY-SEAWELL COMPANY |

| Received by: | For: |
|--------------|------|
| A PRECISION INVESTIGATION & CONSULTING, LLC | Nolan Process Servers, LLC |

| To be served upon: |
|--------------------|
| Great American E&S Insurance Copmpany |

I, Dale Dorning, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

| Recipient Name / Address: | Shellie Romard, Company: 301 E 4th St 25th Fl, Cincinnati, OH 45202-0017 |
|---------------------------|---------------------------------------------------------------------------|
| Manner of Service: | Business, May 10, 2021, 2:55 pm EDT |
| Documents: | SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION; SECOND CORRECTED NOTICE OF TAKING DEPOSITION DUCES TECUM; (Received May 10, 2021 at 8:20am EDT) |

**Additional Comments:**

1) Successful Attempt: May 10, 2021, 2:52 pm EDT at Company: 301 E 4th St 25th Fl, Cincinnati, OH 45202-0017 received by Shellie Romard. Age: 45; Ethnicity: Caucasian; Gender: Female; Weight: 145; Height: 5'6"; Hair: Blond; Eyes: Blue; Relationship: Authorized Agent; Successful Business Serve

2) Successful Attempt: May 10, 2021, 2:55 pm EDT at Company: 301 E 4th St 25th Fl, Cincinnati, OH 45202-0017 received by Shellie Romard. Age: 45; Ethnicity: Caucasian; Gender: Female; Weight: 145; Height: 5'6"; Hair: Brown; Relationship: Authorized Agent; Successful Business Serve

_____            05/12/2021
Dale Dorning                        **Date**
Ohio PI License 201021001629 / Kentucky PI License
0163

Nolan Process Servers, LLC
7498 Anglewood Lane
Tallahassee,, FL 32309

# EXHIBIT 4

Centennial Bank v. Great American Insurance Company
and Great American E&S Insurance

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALAHASSEE DIVISION**

SIMEON PENTON, on behalf of himself
and all others similarly situated,

          Plaintiff,

   v.

                                 Case No. 4:18-cv-00450-MW-CAS

CENTENNIAL BANK, GREAT
AMERICAN INSURANCE COMPANY,
and OVERBY-SEAWELL COMPANY,

          Defendants.

---

**OBJECTIONS TO SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION,**
**OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL**
**ACTION TO GREAT AMERICAN INSURANCE COMPANY AND GREAT**
**AMERICAN E&S INSURANCE COMPANY**

Non-parties Great American Insurance Company and Great American E&S

Insurance Company (collectively, "Great American") pursuant to Federal Rule of Civil

Procedure 45, hereby responds and objects to defendant Centennial Bank's Subpoena to

Produce Documents:

**<u>GENERAL OBJECTIONS</u>**

1.      Great American objects to each document request to the extent they are

unduly burdensome, vague and ambiguous, or overly broad, or seek responses and/or

information which are irrelevant to any parties' claims or defenses, are not proportional

to the needs of the case, and/or are outside the permissible scope of discovery.

2.      Great American objects to each document request and to the extent it

seeks information and documents protected by the attorney-client privilege, the work product doctrine, the mediation privilege, the common interest doctrine, and/or any other applicable privilege or protection.

3.      Great American objects to each document request to the extent they seek information or documents protected as trade secrets, or the confidential, business, proprietary, or commercial information of Great American.

4.      Great American objects to each document request to the extent they invade the privacy interests of third parties and parties to this action.

5.      Great American objects to each document request to the extent they seek information or documents that are confidential or protected under the Florida Insurance Code or the Constitutions of the State of Florida or the United States.

The responses are based on information presently available to Great American. The fact that Great American has responded is not intended, and shall not be construed, as a waiver by Great American of any objection. Great American hereby reserves the right to make further objections as information becomes known.

## <u>OBJECTIONS TO DOCUMENTS/THINGS TO BE PRODUCED</u>

A.    <u>General Documents</u>

1.      All documents containing non-duplicative actuarial information (i.e., only one document containing a given set of actuarial information needed to be produced, not withstanding the "all documents" requirement), regarding the pricing of risk premiums of modelling of portfolio risk for FPI policies written by you, <u>that was publicly disclosed</u> at any time from January 1, 2016 through the present date.

**Great American's Response:** Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses

and are not proportional to the issues in the case. Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

2. All documents constituting communications between YOU and Southern Pioneer Property and Casualty Insurance Company regarding negotiations of premiums of FPI policy for which Centennial would be a named insured, including but not limited to the policy numbers disclosed herein. For the avoidance of doubt, this request concerns the negotiation and setting of policy terms and shall be construed to exclude the calculation of the premium for any specific insured property.

**Great American's Response:** Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.

Subject to and without waiving the foregoing objections, Great American will not produce any documents in response to this request because no responsive documents exist related to Centennial Bank or this action.

3. All documents constituting communications between You and Centennial regarding negotiations of premiums of FPI policy for which Centennial would be a named insured, including but not limited to the policy numbers disclosed herein. For the

avoidance of doubt, this request concerns the negotiation and setting of policy terms and shall be construed to exclude the calculation of the premium for any specific insured property.

**Great American's Response:** Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case. Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

4. To the extent not included in the above, any documents that identify any contractual relationship between Centennial and Southern Pioneer Property and Casualty Insurance Company, other than the relationship in which Southern Pioneer Property and Casualty Insurance Company serves as the insurance broker for Centennial.

**Great American's Response:** Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case. Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will not produce any documents in response to this request because no responsive documents exist related to Centennial Bank or this action.

5.     Any non-duplicative written remarks concerning FPI pricing and commission structures delivered by You (including agents and lobbyists operating on Your behalf) to any insurance regulator or legislative, or other local governmental body operating in the United States, such remarks being delivered at any time between January 1, 2016 and the present date.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.   Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

B.     Policy Number E029008

6.     One form exemplar policy for each different FPI product family, available from You at any time from January 1, 2016 to the present date, providing coverage of the same type as that provided by Policy Number E029008.  If You contend that Policy

Number E029008 is materially similar to the form exemplar policy and You provide a statement to that effect, no documents need be provided in response to this request.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.  Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce the form of Policy Number E029008.

7.      The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2016.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.  Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

8.      The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2016.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.  Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.  Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

9.      The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **one of the five lowest** "Occupied Rate"

numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2017.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.  Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

10.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2017.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.  Great American further objects to this

request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

11.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2018.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.  Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

12.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period

commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2018.

      **Great American's Response:** Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case. Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

      Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

      13.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2019.

      **Great American's Response:** Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses

and are not proportional to the issues in the case. Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

14. The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029008, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2019.

**Great American's Response:** Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case. Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

15.     All documents containing non-duplicative pricing information (i.e., only one document containing a given set of pricing information need be produced, notwithstanding the "all documents" requirement) of any market competitor, for any product family directly competitive to Policy Number E029008, during the period from January 1, 2016 through the present date.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.   Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

C.     Policy Number E029009

16.     One form exemplar policy for each different FPI product family, available from You at any time from January 1, 2016 to the present date, providing coverage of the same type as that provided by Policy Number E029009.  If You contend that Policy Number E029009 is materially similar to the form exemplar policy and You provide a statement to that effect, no documents need be provided in response to this request.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request

to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.    Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce the form of Policy Number E029009.

17.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2016.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.    Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

18.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2016.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.   Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

19.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2017.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.    Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

20.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2017.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.    Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

21.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2018.

**Great American's Response:** Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case. Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

22.    The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **the median** "Occupied Rate" numbers for a

Dwelling, measured against all comparable FPI policies whose policy period commenced in 2018.

**Great American's Response:** Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case. Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

23. The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **one of the five lowest** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2019.

**Great American's Response:** Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case. Great American further objects to this

request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

24.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029009, that reflects **the median** "Occupied Rate" numbers for a Dwelling, measured against all comparable FPI policies whose policy period commenced in 2019.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.   Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

25.     All documents containing non-duplicative pricing information (i.e., only one document containing a given set of pricing information need be produced,

notwithstanding the "all documents" requirement) of any market competitor, for any product family directly competitive to Policy Number E029009, during the period from January 1, 2016 through the present date.

**Great American's Response:** Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case. Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

D.   Policy Number E029010

26.   One form exemplar policy for each different FPI product family, available from You at any time from January 1, 2016 to the present date, providing coverage of the same type as that provided by Policy Number E029010. If You contend that Policy Number E029010 is materially similar to the form exemplar policy and You provide a statement to that effect, no documents need be provided in response to this request.

**Great American's Response:** Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case. Great American further objects to this

request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce the form of Policy Number E029010.

27.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2016 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **one of the five lowest** pricing rates for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2016.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.   Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

28.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2016 for FPI insurance providing protection comparable to that provided

by Policy Number E029010, that reflects **the median** pricing rate for Residential

coverage in Flood Zone A in Florida, measured against all comparable FPI policies

whose policy period commenced in 2016.

      **Great American's Response:**  Great American objects to this request as vague,

ambiguous, overbroad, and burdensome.   Great American further objects to this request

to the extent it requests documents that are not relevant to any parties' claims or defenses

and are not proportional to the issues in the case.   Great American further objects to this

request on the ground that it seeks documents that contain confidential, proprietary, or

trade secret information.

      Subject to and without waiving the foregoing objections, Great American will

produce non-privileged portions of the underwriting file for Centennial Bank and filed

rate information in response to this request.

      29.    The pricing schedule sheet (i.e., the policy declarations page or pricing

schedule/exhibit), with the named insured redacted, for any policy whose policy period

commenced in 2017 for FPI insurance providing protection comparable to that provided

by Policy number E029010, that reflects **one of the five lowest** pricing rates for

Residential coverage in Flood Zone A in Florida, measured against all comparable FPI

policies whose policy period commenced in 2017.

      **Great American's Response:**  Great American objects to this request as vague,

ambiguous, overbroad, and burdensome.   Great American further objects to this request

to the extent it requests documents that are not relevant to any parties' claims or defenses

and are not proportional to the issues in the case.   Great American further objects to this

request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

30.     The pricing schedule sheet (i.e., the policy declarations mage or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2017 for FPI insurance providing protection comparable to that provided by Policy Number E29010, that reflects **the median** pricing rate for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2017.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.   Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

31.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period

commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **one of the five lowest** pricing rates for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2018.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.   Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

32.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2018 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **the median** pricing rate for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2018.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses

and are not proportional to the issues in the case. Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

33. The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **one of the five lowest** pricing rates for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2019.

**Great American's Response:** Great American objects to this request as vague, ambiguous, overbroad, and burdensome. Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case. Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

34.     The pricing schedule sheet (i.e., the policy declarations page or pricing schedule/exhibit), with the named insured redacted, for any policy whose policy period commenced in 2019 for FPI insurance providing protection comparable to that provided by Policy Number E029010, that reflects **the median** pricing rate for Residential coverage in Flood Zone A in Florida, measured against all comparable FPI policies whose policy period commenced in 2019.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case.   Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

35.     All documents containing non-duplicative pricing information (i.e., only one document containing a given set of pricing information need be produced, notwithstanding the "all documents" requirement) of any market competitor, for any product family directly competitive to Policy Number E029010, during the period from January 1, 2016 through the present date.

**Great American's Response:**  Great American objects to this request as vague, ambiguous, overbroad, and burdensome.   Great American further objects to this request

to the extent it requests documents that are not relevant to any parties' claims or defenses and are not proportional to the issues in the case. Great American further objects to this request on the ground that it seeks documents that contain confidential, proprietary, or trade secret information.

Subject to and without waiving the foregoing objections, Great American will produce non-privileged portions of the underwriting file for Centennial Bank and filed rate information in response to this request.

Dated this 23rd day of June, 2021.

Alexander E. Potente
California Bar No. 208240
alex.potente@clydeco.us
Bradley R. Harding
California Bar No. 299842
brad.harding@clydeco.us
CLYDE & CO US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 23rd day of June 2021, a true and correct copy of the foregoing has been furnished via electronic mail to:

Robert C. Gilbert, Esq.
robert@gilbertpa.com
gilbert@kolawyers.com
morales@kolawyers.com
dalia@gilbertpa.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134

*Attorneys for Plaintiff, Simeon Penton*

Joseph P. Guglielmo, Esq.
Michael P. Srodoski, Esq.
Thomas K. Boardman, Esq.
jguglielmo@scott-scott.com
tboardman@scott-scott.com
msrodoski@scott-scott.com
scott-scott@ecf.courtdrive.com
khogan@scott-scott.com
kjager@scott-scott.com
efile@scott-scott.com
SCOTT & SCOTT
ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169

*Attorneys for Plaintiff, Simeon Penton*

Greg L. Davis
(*pro hac vice forthcoming*)
gldavis@knology.net
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117

*Attorneys for Plaintiff, Simeon Penton*

Erin Green Comite, Esq.
ecomite@scott-scott.com
SCOTT & SCOTT
ATTORNEYS AT LAW, LLP
156 South Main Street
P.O. Box 192
Colchester, CT 06415

*Attorneys for Plaintiff, Simeon Penton*

Keith L. Bell, Jr., Esq.
Trevor A. Thompson, Esq.
kbell@clarkpartington.com
tthompson@clarkpartington.com
CLARK PARTINGTON
106 East College Avenue, Suite 600
Tallahassee, FL 32301

*Attorneys for Defendant, Centennial Bank*

Daniel E. Harrell, Esq.
dharrell@clarkpartington.com
CLARK PARTINGTON
P.O. Box 13010
Pensacola, FL 32591-3010

*Attorneys for Defendant, Centennial Bank*

_____
Andrea Mackenzie